## FRANKLIN SAVINGS ASSOCIATION and Franklin Savings Corporation, Plaintiffs,

v.

## DIRECTOR OF THE OFFICE OF THRIFT SUPERVISION, Defendant.

### Civ. A. No. 90–4054–S.

United States District Court, D. Kansas.

Sept. 5, 1990.

Charles W. German, David E. Everson, Jr., Brant M. Laue, Richard F. Hunter, Stinson, Mag & Fizzell, Kansas City, Mo., Roger D. Stanton, Stinson, Mag & Fizzell, Overland Park, Kan., for plaintiffs.

Thomas J. Segal, Assoc. Chief Counsel, Elizabeth R. Moore, Sr. Trial Atty., James Hendrickson, Trial Atty., Washington, D.C., Nancy L. Ulrich, Asst. Atty. Gen., Topeka, Kan., Paul W. Grace, Steven W. Dimmick, Mary Boney Denison, Linda Hitt Thatcher, Paul J. Kennedy, Graham & James, Washington, D.C., Cheryl Johnson, Graham & James, Los Angeles, Cal., Lee Thompson, U.S. Atty., Topeka, Kan., Stuart M. Gerson, Asst. Atty. Gen., Theodore C. Hirt, Mark Batten, Gary Orseck, Attys., Dept. of Justice, Washington, D.C., Thomas J. Loughran, Susan B. Bovee, H. Lowell Brown, Finkelstein, Thompson & Loughran, Washington, D.C., Jan Hamilton, Hamilton, Peterson, Tipton & Keeshan, Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

In this case, Franklin Savings Association ("Franklin" or "the institution") and Franklin Savings Corporation ("FSC") challenge the Office of Thrift Supervision's ("OTS" or "the regulator") February 15, 1990, decision to appoint the Resolution Trust Corporation ("RTC") as conservator for the institution. Franklin attacks the legality of the appointment and seeks removal of the conservator, pursuant to Section 5(d)(2)(E) of the Home Owners' Loan Act ("HOLA"), as amended by Section 301 of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), 103 Stat. 292 (to be codified at 12 U.S.C. § 1464(d)(2)(E)).

This case was filed on March 12, 1990, and was placed on an accelerated docket, given the crucial importance of timely action regarding this matter. An 18–day trial to the court was conducted between June 25, 1990, and July 20, 1990. In addition to considering the testimony and evidence presented at trial, the court has read numerous depositions submitted by the parties and has thoroughly examined the three volume administrative record compiled by OTS regarding the appointment of conservator. The court is now prepared to rule.

As an initial matter, the court wishes to comment that this is not a case involving an infamous or notorious savings and loan association, the likes of which the public has recently become more than familiar. This is not a case involving fraud, corruption, or self-dealing by the management or directors of Franklin.[1] There has been no allegation or even hint of illegal or unethical conduct by Franklin's management or directors. Essentially, this case boils down to a dispute over accounting practices. With that said, the following constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. THE PROPER ROLE OF THE COURT.

Before discussing the specific findings and conclusions in this case, it is necessary for the court to address exactly what role it is to play when a savings association challenges the regulator's appointment of a conservator. Legal questions must be resolved regarding the standard of review to be applied in reviewing the regulator's actions; the burden of proof; and what evidence the court can consider in resolving this case. In FIRREA Congress specifically provided for judicial review of the regulator's appointment of conservator.[2]

---

1. The court has reviewed defendant's recent submission of additional authority, *Lincoln Savings & Loan Assoc. v. Wall,* 743 F.Supp. 901 (1990, D.D.C.). The court finds this authority of little value or guidance to the present case. The facts established in *Lincoln* show clear justification for the regulator's actions. Here, unlike in *Lincoln,* the directors and management of Franklin have not abused their position and have not been looting the institution. Each case must be resolved on its own factual situation.

2. FIRREA specifically states:

The Director shall have exclusive power and jurisdiction to appoint a conservator or receiver for a Federal savings association. If, in the opinion of the Director, a ground for the

## A. Standard of Review.

■ The provision of FIRREA which allows judicial review of the OTS's decision to appoint a conservator does not expressly define the scope or standard of that review.[3] Since the statute does not specifically define the standard of review to be used in examining regulator's action, the court must look to the Administrative Procedures Act for guidance on this issue. See *Washington Federal Savings & Loan Ass'n v. FHLBB*, 526 F.Supp. 343, 350, 353–54 (N.D.Ohio 1981). Section 706 of the Administrative Procedures Act ("APA") sets forth the standard of review appropriate for a court reviewing an administrative agency's action.[4] The APA provides that an agency action must be set aside if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action failed to meet constitutional, statutory, or procedural requirements. 5 U.S.C. § 706(2)(A), (B), (C), (D). Although the APA allows for *de novo* review in limited situations, 5 U.S.C. § 706(2)(F), the court finds that it is not applicable to the present case and that the standards set out in 5 U.S.C. § 706(2)(A), (B), (C) and (D) apply in the present proceeding. Under the arbitrary, capricious and abuse of discretion standard, the agency's decision is entitled to a presumption of regularity. The presumption, however, does not shield the agency's action from "a thorough, probing, in depth review." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). The court must consider whether the OTS's decision to appoint a conservator was based on the consideration of the relevant factors and whether there has been a clear error of judgment. *Id.* at 416, 91 S.Ct. at 823–24. "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* Notwithstanding this deference, the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463

appointment of conservator or receiver for a savings association exists, the Director is authorized to appoint ex parte and without notice a conservator or receiver for the savings association. In the event of such appointment, the association may within 30 days thereafter, bring an action in the United States district court for the judicial district in which the home office of such association is located ... for an order requiring the Director to remove such conservator or receiver, and the court shall upon the merits dismiss such action or direct the Director to remove such conservator or receiver.
FIRREA, Pub.L. No. 101–73, 103 Stat. 292, amending § 5(d)(2)(E) of HOLA (to be codified at 12 U.S.C. § 1464(d)(2)(E)). The statute provides this court with jurisdiction over this matter and venue since Franklin's home office is in Ottawa, Kansas, within this judicial district.

3. The court is aware that the statute provides that the court shall "upon the merits" grant appropriate relief. This court finds that the "upon the merits" language does not specifically concern the standard of review in this action, but instead concerns the scope of evidence that the court may consider in reaching a decision. See, *infra*, at pp. 1096–97.

4. Section 706 states:

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962)).

B. *Burden of Proof.*

 The general rule is that the party challenging an agency's action has the burden of proving error. *Telegraph Savings & Loan Ass'n v. FSLIC*, 564 F.Supp. 862, 870 (N.D.Ill.1981) (citing *Pacific States Co. v. White*, 296 U.S. 176, 56 S.Ct. 159, 82 L.Ed. 138 (1935)). A presumption of validity exists for the agency's action. When an agency acts ex parte, as in the present case, its decision is still entitled to presumption of correctness, albeit a lesser one. *Telegraph Savings & Loan*, 564 F.Supp. at 870. Thus, the burden is on Franklin to overcome this presumption and to show by the preponderance of the evidence that the agency's decision lacked any basis in fact or law or was arbitrary, capricious, or an abuse of discretion.

C. *Evidence the Court Can Properly Consider.*

 Throughout this case, the parties have disputed what evidence the court may properly consider in making its judicial review of the OTS's action. The OTS contends that the court is limited to reviewing solely the administrative record which OTS has prepared and filed with the court. The OTS argues that the court must determine if the agency's action is supported by the administrative record. Franklin insists that the court consider evidence outside the administrative record to determine the appropriateness of the conservatorship. The court has received an extensive amount of evidence outside the administrative record during the trial of this case, but took under advisement the issue of whether such evidence could be considered in determining the issues before the court.

After considering the parties' arguments and reviewing much case law, and some of the facts established in this case, this court finds, and is convinced, that evidence outside the administrative record may be prop-

erly considered. First, the court notes that the statutory scheme for judicial review set out in FIRREA calls for review "upon the merits." Courts interpreting this "unusual" phrase have reached a variety of conclusions on its meaning and what type of review is required by the phrase "upon the merits." Some courts find that the phrase should be given no different effect than the phrase "on the record," and thus, apply the traditional arbitrary and capricious standard of review, in which the court simply reviews the administrative record and determines whether, based on *that* record, the agency's action was arbitrary and capricious or an abuse of discretion. *See Woods v. Federal Home Loan Bank Board*, 826 F.2d 1400, 1406–07 (5th Cir.1987), *cert. denied*, 485 U.S. 959 (1988); *Guaranty Savings & Loan Ass'n v. Federal Home Loan Bank Board*, 794 F.2d 1339, 1342 (8th Cir.1986). Other courts have held that this language in effect provides a *de novo* review of the agency's decision. *See Fidelity Savings & Loan Ass'n v. FHLBB*, 540 F.Supp. 1374, 1377 (N.D.Cal.1982) ("If it means nothing more, the term 'on the merits' reveals that a proceeding under the statute is more in the nature of a *de novo* review than an appellate review."); *Telegraph Savings & Loan Ass'n v. FSLIC*, 564 F.Supp. 862, 869–870 (N.D.Ill.1981);

A third view is advocated in *Collie v. Federal Home Loan Bank Board*, 642 F.Supp. 1147, 1150–52 (N.D.Ill.1986). The *Collie* court determined that the "upon the merits" language provides for a hybrid type of review in which the court would continue to apply the arbitrary and capricious standard of review, but that the record on which the review would be based is expanded. The challenging party is provided an opportunity to present evidence in addition to the administrative record. As the *Collie's* court properly surmised:

A reasonable reading of the phrase "upon the merits" is rather that it means a review in which the FHLBB [predecessor of OTS] does not necessarily control the evidence which reaches the reviewing court. "Upon the merits" contrasts with the more usual "on the record." Con-

gress must not have intended for judicial review always to be confined to an administrative record.... [T]he challenging association should have the opportunity to submit evidence whether or not that evidence was considered by the Board, and to develop any facts bearing on the question of whether any of the statutory grounds existed. "Upon the merits" means that both parties to the reviewing action have the right to develop the judicial record.

Nevertheless, it does not follow from that conclusion that review "upon the merits" is the equivalent of either a *de novo* hearing or *de novo* review of the evidence.... The FHLBB's opinion that insolvency, violations or unsound practices existed therefore must carry some weight.

*Collie,* 642 F.Supp. at 1151 (citations omitted). The essence of the "upon the merits" language is that the savings association is provided with a meaningful opportunity to present its case in opposition to the appointment of the conservator at some point during the process leading to the appointment. If such meaningful opportunity has not been provided, "then the court should provide that opportunity." *Id.* at 1152.

This court agrees with the *Collie* court's interpretation of the phrase "upon the merits." To allow the government to seize control of plaintiffs' business and assets in an ex parte nature without a previous adversarial hearing would deny plaintiffs any meaningful opportunity to present their position. The court finds that to allow this sort of seizure of property without at least allowing plaintiffs a post-seizure opportunity to present evidence supporting their case in opposition of the conservatorship, would definitely raise serious constitutional due process concerns. *See, infra,* Conclusion of Law No. 15. The court chooses to interpret this statutory language in a manner that will allow it to withstand a constitutional challenge. The statutory scheme grants OTS the exclusive power to place the institution in conservatorship ex parte and without notice. Section 5(d)(2)(E) of HOLA as amended by Section 301 of FIRREA, Pub.L. No. 101–73 (to be codified at

12 U.S.C. 1464(d)(2)(E)). This scheme is acceptable in light of the necessity that the regulator must act quickly and decisively in reorganizing, operating and dissolving failed institutions. *See Woods* at 1407. However, such an ex parte regulatory scheme may be allowed only if the seized institution is provided with an opportunity to later present its position. This court reads the judicial review provision in FIRREA as providing such an opportunity by judicial review on the merits after the agency's action.

To provide a meaningful review, the court must consider evidence outside the administrative record. Therefore, the court concludes that the "on the merits" review provides the plaintiffs with an opportunity to present evidence outside the administrative record in support of their case and for the court to consider such evidence. However, this hybrid standard of review does not provide for *de novo* review, but for review on whether the agency's action was based on statutory grounds or was arbitrary and capricious or an abuse of discretion after the court has reviewed all evidence presented.

 Aside from the "on the merits" statutory language, the court also finds that evidence outside the administrative record may be considered under other general principles of administrative law. Generally, judicial review of an agency action is limited to review of the record on which the administrative decision was based. *Thompson v. U.S. Dept. of Labor,* 885 F.2d 551, 555 (9th Cir.1989) (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. at 420, 91 S.Ct. at 825–26). Judicial review should be based on the full administrative record in existence at the time of the agency decision. *Public Power Council v. Johnson,* 674 F.2d 791, 794 (9th Cir.1982) (citing *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)). The Ninth Circuit Court of Appeals has expounded on what constitutes the "whole administrative record" by stating:

The whole administrative record, however, "is not necessarily those documents that the *agency* has compiled and sub-

mitted as 'the' administrative record." "The 'whole' administrative record, therefore, consists of all documents and materials directly or indirectly considered by the agency decision-makers and includes evidence contrary to the agency's position."

*Thompson v. U.S. Dept. of Labor,* 885 F.2d at 555 (emphasis in the original) (citations omitted.) Also, the court may consider evidence outside the designated administrative record to determine the adequacy of the designated record. *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988).

■ After considering the evidence presented at trial, the court is convinced that the three volume administrative record as designated by the OTS is not the "whole administrative record" relied on by the agency in reaching its decision to appoint a conservator. The court finds that many documents and matters considered and reviewed by OTS personnel in reaching the decision to appoint a conservator were excluded from the administrative record.[5] The court finds that evidence of additional material considered by the OTS which was not made part of the designated administrative record was properly presented to the court for its consideration in reaching the decision made today. The administrative record presented to the court was a selective compilation of documents considered by OTS and not the "whole administrative record" reviewed and considered by OTS personnel in reaching its decision to appoint a conservator.

■ Moreover, the court finds that the extensive amount of testimony present-ed at the trial explaining finance accounting principles and various types of securities can be properly considered by the court in reaching its decision regarding the appropriateness of the conservatorship. Supplementation of the administrative record is appropriate if necessary to explain technical terms or complex subject matter involved in an agency's action. *Animal Defense Council v. Hodel,* 867 F.2d 1244 (9th Cir.1989) (amending 840 F.2d 1432, 1436 (9th Cir.1988)).

The OTS's decision to appoint a conservator was based on its decisions regarding the accounting principles and practices employed by Franklin and Franklin's involvement in certain security transactions. To adequately review the OTS's actions, the court, by necessity, had to acquire a basic understanding of finance accounting principles and the types of securities in which Franklin was involved. Therefore, the court has properly considered general evidence on these matters. Also, to conduct a legitimate review of the agency's action, the court had to acquire an understanding of the accounting methods used by Franklin and those advocated by the regulator. Thus, the court finds that due to the complex subject matter involved in this case and the technical terms involved, evidence outside the administrative record is appropriate for the court's consideration.

■ Finally, in addition to the reasons set forth above, the court finds that additional evidence outside the administrative record is admissible and may be considered due to the fact that this case concerns disputes over the interpretation of regula-

---

5. The documents missing are numerous. Examples of documents not included as part of the administrative record include correspondence from Franklin responding to matters raised by OTS: Exhibits 314 and 598 (the December 19, 1989, letter responding to OTS's November 3, 1989, concern); Exhibit 316 (Franklin's February 8, 1990, response regarding OTS's concerns on TB 12 assets.); Exhibit 299 (January 5, 1990 letter to Bruce Benson from Franklin and Deloitte & Touche); Exhibit 9 (Kurt Schoeb's January 5, 1990, letters to Benson). Many meetings between OTS personnel and Franklin's management or with its independent accountant are mentioned in some documents in the adminis-trative record. However, there is no notation of what issues were discussed or what Franklin's positions were regarding those issues or what statements were made at these meetings. Exhibit 2596 (Benson's January 25, 1990, letter to Franklin regarding Deloitte & Touche's January 5, 1990, letter) is not in the administrative record. Conferences among OTS staff and the OTS decision-makers in Topeka and Washington, D.C., were apparently held regarding the Franklin situation. The contents of these conversations were not made part of the administrative record. *See Biscayne Fed. Savings & Loan v. Federal Home Loan Bank Board,* 572 F.Supp. 997, 1006 (S.D.Fla.1983).

tions. *See Apex Constr. Co. v. United States*, 719 F.Supp. 1144, 1147, n. 1 (D.Mass.1989); *Exxon Corp. v. Dept. of Energy*, 91 F.R.D. 26, 40–42 (N.D.Tex. 1981).

For all the foregoing reasons, the court finds that it is not limited, in its review, to the three volume administrative record as designated by OTS. The court has, and properly so, accepted and considered evidence outside of the three volume administrative record.

## II. FINDINGS OF FACT.

### A. *General Background.*

1. Plaintiff Franklin Savings Association is a federally insured, stock savings and loan association chartered by the state of Kansas in 1889 with its principal place of business in Ottawa, Kansas. Plaintiff Franklin Savings Corp. is a Kansas corporation that holds approximately 94 percent of the issued and outstanding guarantee stock of Franklin. The Ernest Fleischer family is the beneficial owner of 55 percent of FSC. The Ted Greene family is the beneficial owner of the remaining 45 percent. FSC has no material assets other than its Franklin stock. The approximately remaining 6 percent of Franklin's stock, which is not owned by FSC, is owned by Franklin's employees under an employee stock ownership plan or is publicly traded on the National Association of Securities Dealers Automated Quotation ("NAS-DAQ").

2. Franklin's primary business is earning income based on the net spread between the interest income on mortgage related assets and the cost inherent in acquiring and carrying those assets. Mortgage related assets generally consist of loans secured by an interest in real estate and the cash flows from such loans evidenced by pass through certificates, which represent ownership interests in a pool of mortgaged loans, guaranteed by the United States government or its instrumentalities;

mortgaged derivative products secured by such pass through certificates; and private mortgage participation certificates which have received one of the two highest ratings of the rating categories of a nationally recognized rating organization.

3. Defendant Office of Thrift Supervision is an agency of the United States of America. OTS was created in 1989 with the enactment of FIRREA. The director of OTS has all the powers that had been vested in the Federal Home Bank Board prior to the enactment of FIRREA, except for those powers which were transferred to other agencies. Among the powers vested in the director of OTS is the power to appoint a conservator or receiver for a savings association. 12 U.S.C. § 1464(d)(2)(E).

4. David A. Douglass is the commissioner of the Kansas Savings and Loan Department, a state agency responsible for regulating and monitoring the activities of state chartered savings and loan associations.

5. On February 15, 1990, M. Danny Wall, then director of OTS,[6] appointed the Resolution Trust Corporation as conservator of Franklin based on his findings that:

A. Franklin was in an unsafe and unsound condition to transact business, including having substantially insufficient capital or otherwise;

B. Franklin had incurred or was likely to incur losses that would deplete all or substantially all of its capital, and that there was no reasonable prospect for Franklin's capital to be replenished without federally funded assistance;

C. There was a violation or violations of laws or regulations, or unsafe or unsound practice or condition which was likely to cause insolvency or substantial dissipation of both assets or earnings, or was likely to weaken the condition of the association or otherwise seriously prejudice the interest of its depositors.

6. On February 15, 1990, Commissioner Douglas gave written approval that one or

---

**6.** In our earlier *Memorandum and Order* of June 22, 1990, 740 F.Supp. 1535 (D.Kan.1990), this court has found that Director Wall was unconstitutionally appointed to serve as a government officer. However, under the doctrine of *de facto* officer, the court ruled that the actions of Mr. Wall may withstand a challenge based on his unconstitutional appointment.

more of the statutory grounds specified for the appointment of a conservator for Franklin existed.

 7. On March 12, 1990, FSC and Franklin filed this lawsuit[7] contesting OTS's appointment of the RTC as conservator and seeking interim injunctive relief preventing OTS from appointing a receiver.[8]

8. Ernest M. Fleischer served as chairman of the board of Franklin Savings Association until the appointment of conservator on February 16, 1990. Mr. Fleischer has a bachelor of arts degree, a bachelor of science degree in business administration and a masters degree in business administration from Washington University in St. Louis, Missouri. He also has a law degree from Harvard Law School. In 1957 Mr. Fleischer passed the certified public accountant (CPA) examination.

9. Mr. Fleischer practiced tax law from 1959 to 1985 and has been involved in the regulation and operation of the thrift industry since the 1960s in connection with his law practice.

10. In 1967 Mr. Fleischer acquired 25 percent interest in General Savings Association. Mr. Fleischer, Carson Cowherd and Ted Greene were the owners of General Savings Association. Following an exchange of stock between Messrs. Cowherd and Fleischer, Mr. Fleischer relinquished his interest in General Savings Association and acquired an interest in Franklin Savings Association.

11. In 1974 Franklin reported an accounting loss. Thereafter, Harry Coffman, a member of Franklin's board of directors, commented on the inherently risky nature of the business of operating a savings and loan association. Coffman noted that the risk in the thrift industry resulted from the fact that thrift institutions had to solicit from the public short term deposits to invest in long term fixed rate assets. If interest rates increased, the savings and loan would have to pay increasing rate on deposits even though it had been previously locked into a fixed rate of return on its assets portfolio of long term home loans. If interest rates increased, the association would also face a potential credit crunch because depositors would withdraw their money from the savings and loan institution, whose maximum interest rate at that time was set by regulation, and invest it in institutions offering higher rates of return.

12. Another risk to which Franklin and other thrifts are exposed is prepayment risk. Prepayment risk results from the option included in home mortgages which allows the home mortgagor to prepay the mortgage obligation. The mortgagor will more likely exercise this option if the prevailing interest rate drops below the rate of the mortgage note.

13. In the late 1970s and early 1980s, interest rates rose dramatically from about 8 percent to about 18 percent, a change of 1000 basis points. A basis point is $\frac{1}{100}$ of 1 percent change in interest rate. A change in 100 basis points equals a change of 1

---

7. Defendant has moved to dismiss this action on the grounds that it was initiated by Mr. Fleischer on behalf of the institution and that he lacked authority to initiate such suit on behalf of the institution. The court finds as fact that the board of directors delegated to Mr. Fleischer, as chairman of the board, the authority to initiate a lawsuit on behalf of the institution if it was necessary. The board made a determination to challenge the OTS's ordered adjustments "by all appropriate means." This determination would include the initiation of the present lawsuit. This is not a case of a shareholder bringing a derivative suit, and thus, defendant's reliance on *Gaubert v. FHLBB*, 863 F.2d 59 (D.C.Cir.1988) is not persuasive. The court finds that without doubt the institution authorized and wanted this lawsuit prosecuted and that Mr. Fleischer was authorized to initiate this suit in the name of the

institution. Finally, it is generally recognized that if a corporation does not object to an officer's lack of authority, a third person may not so object. *See Farmer's Union Oil Co. v. Maixner*, 376 N.W.2d 43, 46 (N.D.1985); *Int'l Tours and Travel v. Khalil*, 491 A.2d 1149, 1153 n. 9 (D.C.App.1985); *Village of Brown Deer v. City of Milwaukee*, 16 Wis.2d 206, 114 N.W.2d 493, 497, cert. denied 371 U.S. 902, 83 S.Ct. 205, 9 L.Ed.2d 164 (1962).

8. Pursuant to an agreed order entered by this court on March 30, 1990, plaintiffs were granted a preliminary injunction preventing the OTS from converting the conservatorship into a receivership without 24 hours notice to the court and to Franklin.

percent in the interest rate. This period of dramatic escalation of interest rates caused the true thrift crisis in the United States.

14. At the time of these rapidly rising interest rates, the balance sheet of Franklin appeared favorable based on GAAP figures, under which its assets were carried at a historical cost, rather than current market value. Franklin knew, however, that if interest rates remained high, capital would soon become depleted because depositors would invest their funds at new higher rates as their deposits matured with Franklin.

15. During the late 1970s and early 1980s, Congress responded to the crisis in the thrift industry by deregulating that industry and allowing thrifts to enter broader categories of business and to no longer cap the rate at which the institutions could pay interest on deposits. *See generally* The Depository Institutions Deregulation Act of 1980, Pub.L. No. 96–221, 94 Stat. 142 (1980); and The Garn–St Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, 96 Stat. 1469 (1982).

16. During this period, Franklin discovered that it had economic losses in place that ranged from $40–60 million. To address these losses, Franklin retained Dr. Wayne Angell, then a professor of economics and finance at Ottawa University in Ottawa, Kansas.[9] Dr. Angell was retained to determine whether Franklin could earn back the losses already in place and continue to operate as a profitable business.

17. In 1981 Dr. Angell determined that Franklin could earn a safe profit on the purchase of Government National Mortgage Association ("GNMA") mortgage backed securities ("MBS"). Dr. Angell's analysis indicated that these securities could be purchased at a value that far exceeded the cost of funds to carry those assets.

18. In 1982 Franklin began buying deep discount Federal National Mortgage Association ("Fannie Mae") and Federal Home Loan Mortgage Corp. ("Freddie Mac") mortgage backed securities. These securities, unlike the GNMA assets, were not backed by the full faith and credit of the United States government, but carried federal agency status. Franklin decided to acquire these securities because at that time the market for such securities did not present a credit risk to Franklin. Also at that time, Franklin began to sell its deep discount GNMA securities, since the Fannie Mae and Freddie Mac securities provided a better investment for Franklin.

19. In 1982 Franklin was initially contacted by the consulting firm of Smith, Breeden & Associates ("Smith, Breeden"). Smith, Breeden instructed Franklin that it could hedge the risk present from the repricing of its liabilities and thus manage the institution's interest rate risk.

20. Smith, Breeden advised Franklin to hedge interest rate risk in the financial futures market. As a condition to receiving advice from Smith, Breeden, Franklin agreed not to enter the financial futures market for purposes of speculation.

21. Franklin initially used Smith, Breeden's services to hedge the maturity mismatch between its assets and liabilities. In this hedging program, if interest rates increased, Franklin would experience gains from its positions in the futures market which would be used to offset its increased cost for funding deposit liabilities at a new higher rate of interest. Conversely, if interest rates declined, the losses suffered in the futures market would be offset by the gains from the repricing of the liabilities.

22. In 1984 interest rates were very high and a demand was created in the market for very long term (longer than 30 years) zero coupon bonds. Since the very long term rates were lower than the 30 year treasury rate, a market opportunity existed for Franklin to issue such long term obligations. Franklin filed an application with the Federal Home Loan Bank Board (the regulatory predecessor of the OTS) to issue such a bond obligation. The application was approved and Franklin issued $2.9 billion in zero coupon bonds.

9. Dr. Angell currently is a member of the Board of Governors of the Federal Reserve System.

23. From June 1984 until the spring of 1985, interest rates declined significantly. This decline caused the deep discount assets in Franklin's portfolio to approach par. As a consequence, the prepayment option in the home loan pools owned by Franklin was no longer solely favorable to Franklin. Franklin found itself in a position in which it needed protection from both the risk of increasing and decreasing interest rates. Thus, Franklin took short positions in the futures market, as it had done with respect to the repricing of liabilities, and also took steps to repurchase from the market the prepayment option that the home owner possessed in order to manage the prepayment risk.

24. In an effort to purchase options to hedge the prepayment risk, Smith, Breeden recommended that Franklin purchase current coupon obligations. During 1985, Franklin sold the deep discount loans in its portfolio. Current coupon loans were purchased when Franklin began purchasing put and call options. A put option is the right to deliver a security at a fixed price so that if interest rates go up and the value of the security goes down, Franklin can collect the higher price. A call option gives a party the right to buy an obligation at today's price, even if interest rates decline and the price of the security increases.

25. In December 1985 Dr. Angell determined that Franklin needed to purchase more call options to protect against the possibility of declining interest rates. He reported these findings to Franklin's officers in early 1986.

26. After determining the number of options it needed to purchase to be fully hedged, Franklin learned that if such options were purchased, Franklin would have virtually no net income for 1986. This finding was consistent with Dr. Angell's findings in the early 1980s that a par value loan cannot be fully hedged by a thrift and produce economic value.

27. After Franklin purchased the options enabling it to be hedged, interest rates went down in early 1986. The options which it had purchased were due to expire in May 1986. Franklin sold these options and realized a gain from these sales. The sales resulted in approximately $140 million in option gains that were recognized at that time and not deferred over future years.

28. In its annual report for the year ended June 30, 1986, Franklin reported the gain from the options' sales under GAAP and noted that the sales distorted the firm's income pattern since it caused an immediately recognized gain which otherwise would have come in ratably over approximately a 7–10 year period.

29. Following the 1986 options sales, Franklin began acquiring longer term assets to match its longer term liabilities. Franklin bought federal agency zero coupon obligations which had maturity dates of approximately the same as the zero coupon bonds issued by Franklin in late 1984. Since these agency obligations were bought and sold in a market at a very tight spread over the U.S. Treasury rate, it was difficult for Franklin to make money on the agency zero coupon obligations. Thus, Franklin sought to replace these obligations with home loan cash flows which could match the interest rate sensitivity of the agency zero coupon bonds.

30. To replace the agency zero coupon bonds, Franklin assembled several hundred million dollars of mortgage backed securities and ultimately issued a one billion dollar collateralized mortgage obligation ("CMO"). A CMO consists of a series of traunches into which home loan cash flows are carved.

31. Some traunches in the CMO represent the early payments that come due on the home loans represented in the CMOs. Other traunches represent the later payments on the home loans. The traunches comprising the earliest payments represent very certain cash flows which can be sold at a very tight spread over the treasury yield curve. The traunches representing the later payments, and which Franklin retained in its portfolio, represent less certain cash flows having a wider spread to the treasury yield curve. Franklin benefited from retaining these later payments because the value sensitivity of these later

payments is similar to the sensitivity of the zero coupon obligations which Franklin sought to replace and which matched Franklin's long term liabilities.

32. With respect to the $1 billion CMO, Franklin sold two traunches representing cash flows due during the first four years of the home loans in the CMO. These were sold in the summer of 1986. These early payment traunches accounted for approximately $600 million; whereas the later payment traunches retained by Franklin accounted for approximately $400 million in cash flows.

33. At this same time, Franklin acquired another $1 billion in mortgage backed securities to create and issue another similar CMO. Franklin financed these acquisitions through Merrill Lynch at a short term rate that changed every 30 days. To hedge this financing expense, Franklin sold short positions in the futures market. When Franklin determined that it was not necessary to issue the additional CMO, it sold the billion dollars worth of home loans, closed out the associated liabilities and terminated the short positions. Franklin reported both the gains recognized from the sales and the hedged losses at the same time on its financial statements for the year ended June 30, 1987.

34. In August 1986, FHLBB–Topeka raised various questions concerning the initial CMO issued by Franklin. At that time, Franklin had planned to issue one CMO each month. While FHLBB–Topeka stated in February 1987 that they were satisfied with the manner in which Franklin had issued the CMO, Franklin had decided by that time not to issue additional CMOs.

35. Instead of issuing additional CMOs, Franklin determined in 1987 to purchase principal-only obligations. Franklin concluded that these type of obligations better accomplish the intended purpose of a second CMO. A principal-only obligation ("PO") represents the principal payments on a stream of pooled mortgage cash flows.

36. In 1985 Franklin considered entering the business of acting as a retailer for Smith, Breeden's hedging package. Before entering such business, Franklin insisted that the firms to which it would provide counseling service have the same information and software available to them as did Franklin. Smith, Breeden determined that the Smith, Breeden software, then in Franklin's possession, should be returned. After returning the software, Franklin determined that it was uncomfortable operating without knowing the assumptions that were in the software. These assumptions could only be understood by examining the software and having it continually available.

37. In late 1986, Franklin began the search to hire an individual to lead and develop a research division, in house, at Franklin. The research division was to replace the services that had been provided by Smith, Breeden. In the fall of 1987, John Scowcroft began working at Franklin. Mr. Scowcroft had formerly been the head of the research department at Merrill Lynch.

38. Mr. Scowcroft successfully assembled a highly skilled and talented cadre of professionals in Franklin's newly created research department. This department was comprised of individuals having PhDs in finance and economics and MBAs, and having practical experience at many of the top finance and brokerage firms in the nation. These individuals included Massoud Heidari, who had a PhD from MIT in engineering and who had previously worked at First Boston; Steve Hotopp, who had a PhD from the University of Illinois; and Dick Kazarian, who had a MBA from the University of Chicago and who had worked at Drexell. All these individuals worked on developing Franklin's computer models. Franklin also recruited Liz Kearns, MBA Farleigh, Dickinson University, who had worked at Merrill Lynch and Standard and Poore. Ms. Kearns was hired to work with liability management. Ramine Rouhani, PhD from Stanford in engineering and economics, had worked at Goldman Sachs and CitiCorp, and was hired by Franklin to work with management, hedge analysis and interest rate models. Furthermore, Franklin was successful in recruiting Michael Smirlock, PhD from

Washington University, who had been a tenured professor at the Wharton School of Business. Smirlock was in charge of Franklin's asset acquisitions. Also, Franklin hired William Marshall, PhD from Washington University. Mr. Marshall previously had been co-manager of Goldman Sachs's financial strategies group.

39. On June 30, 1987, Franklin acquired the investment banking firm of L.F. Rothschild & Co. This investment was unsuccessful and in 1989 Franklin took steps to close the Rothschild activity. As a result of the L.F. Rothschild acquisition, Franklin experienced a $35–37 million loss for the fiscal year ended June 30, 1989. If not for the one time loss resulting from the L.F. Rothschild investment, Franklin would have reported a profit for fiscal year 1989, rather than a $9 million loss.

B. *Regulatory History Preceding the 1989 Examination.*

40. From 1980 through August 10, 1988, Franklin was periodically examined by federal and state regulators. From 1984 through August 10, 1988, the Federal Home Loan Bank Board ("FHLBB") had given Franklin a composite rating of "2" in each yearly examination. A "2" rating is the normal rating for a safe and sound institution and indicates that the regulators believe that the institution is fundamentally sound.

41. Franklin received a composite rating of "2" on August 5, 1985, even though the amount of futures losses as of June 30, 1985, was slightly greater than the amount of Franklin's capital on that date.

42. At the time of the 1988 Franklin examination, Franklin owned approximately the same amount of mortgage derivative securities as it did on the date of the imposition of the conservatorship.

43. During the course of the 1988 examination, the FHLBB retained as special consultant, Dr. William C. Handorf. Handorf examined Franklin's hedge correlation accounting policy and its application. The policy examined by Dr. Handorf included the absolute value method which had been in effect at Franklin since April 1988. Dr.

Handorf issued his report on September 16, 1988.

44. Dr. Handorf concluded that Franklin had implemented "a defensible hedging program." However, Dr. Handorf raised some concerns about the correlation policy Franklin used in its hedge program. Dr. Handorf was somewhat troubled by the seven year assumed life of the assets used in the hedge program. He felt the assets duration was shorter. Dr. Handorf was also troubled by the disallowance of the first month's result in determining hedge correlation. Dr. Handorf's report further concluded that there was no evidence that Franklin was involved in any type of speculation on the futures market. Dr. Handorf summarized his conclusions by stating that the hedging program implemented by Franklin appeared reasonable, and although the method of calculating correlation is generally acceptable, certain rules should be revised. Dr. Handorf recommended that the FHLBB conduct a "limited" or "special" examination prior to the end of fiscal year 1989 regarding his concerns about the correlation policy.

45. In the fall of 1988, Jerry Mayne, Franklin's chief administrative officer, was contacted by a consultant who had been the executive vice president of the Federal Home Loan Bank of Topeka to determine if Franklin would be interested in bidding on failed thrifts in Missouri. While no Missouri thrift was available for Franklin's bid, the Federal Savings and Loan Insurance Corp. informed Franklin of the possibility of bidding on Beverly Hills Savings & Loan, a failed California thrift. In the fall of 1988, Franklin notified FHLBB–Topeka of its interest in bidding on Beverly Hills Savings & Loan. The Kansas Savings and Loan Department in its exercise of regulatory jurisdiction over Franklin reviewed the intended Beverly Hills' acquisition.

46. Franklin retained the investment banking firm of Goldman Sachs to assist Franklin in reviewing Beverly Hills Savings & Loan in preparation of its bid. In December 1988, Franklin learned from Jay Jupiter, of FSLIC, that FHLBB–Topeka had determined that Franklin was not a

qualified bidder for the Beverly Hills institution. FHLBB–Topeka had withdrawn its approval of Franklin as a qualified bidder for Beverly Hills Savings & Loan. In January 1989, representatives from Franklin met in Washington, D.C., with FHLB representatives, including Tommie Thompson and Darrell Dochow. At that meeting, Franklin stated that it would resolve any of the regulator's concerns if FHLB would allow Franklin to go ahead and acquire Beverly Hills. FHLB incorrectly interpreted Franklin's offer to resolve differences as a sign of desperation.

47. Immediately following the Beverly Hills episode, the Office of Regulatory Activities ("ORA") of FHLBB in Washington, D.C., generated a list of hedge accounting issues concerning Franklin. The FHLBB ultimately pursued only one of these issues, the issue concerning the hedge accounting by Franklin for its zero coupon bonds.

48. The chief accountant's office of FHLBB in Washington conducted an extensive follow-up on Dr. Handorf's report and examined Franklin's accounting practices. FHLBB accounting fellow, Julie Gerschick, prepared draft reports to Tommie Thompson of FHLBB–Topeka raising various questions.

49. The Topeka regulators elected to pursue two issues with Franklin. One involved the amortization period for futures gains and losses and the other involved amortization of hedge losses on zero coupon bonds.

50. Ultimately, the issue which the regulators pursued against Franklin was the hedge accounting for zero coupon bonds. This issue was resolved for all practical purposes in Franklin's favor.

51. After December 1988 and the failed attempt to acquire Beverly Hills Savings & Loan, Franklin began a series of monthly meetings with federal regulators. Franklin proposed these meetings in order to keep the regulators up to date on what Franklin was doing and so that Franklin could hear any regulatory concerns.

52. In early 1988 Franklin began discussions with Goldman Sachs to explore raising additional capital. Franklin sought this additional capital to obtain a very high interest grade rating. Because of adverse regulatory action against Franklin in connection with the Beverly Hills' matter, and because of the pending FIRREA legislation, Goldman Sachs advised that it would be highly unlikely that Franklin could raise the desired additional capital during that year.

53. In the spring of 1989, Franklin decided that it would reduce its size by approximately $5 billion so that it could achieve an 8 percent capital level which was necessary to obtain a high investment grade rating.

54. Following the resolution of the hedge loss amortization issues on the zero coupon bonds following the 1988 examination, OTS–Topeka wrote a letter to Franklin stating that it still had concerns about certain aspects of its hedge accounting program. This letter caused Franklin and its outside auditors to be concerned about Franklin's annual report (Form 10K) for the fiscal year ended June 30, 1989.

55. After many discussions, Louis V. Roy, deputy district director of OTS–Topeka, wrote Franklin on September 27, 1989, and stated that OTS was not in a position to make supervisory objections to Franklin's hedge accounting practices at that time. His letter stated that OTS "will continue to review and analyze Franklin's hedge accounting practices in the future." Franklin considered this statement to be consistent with OTS's ongoing regulatory duties and not a statement that any issues remained open. Mr. Fleischer understood this letter, together with the 1988 examination of Franklin, as indicating that as of September 1989 OTS had no legitimate concerns regarding Franklin's past accounting practices.

C. *The Regulatory Examination of October 1989 Through February 1990.*

56. Commencing October 16, 1989, a concurrent joint regular examination of Franklin Savings Association was conduct-

ed by the OTS, KSLD and the Federal Deposit Insurance Corp. (FDIC).

57. In late 1988 some members of the FHLBB–Topeka staff were highly criticized for their handling of Silverado Savings & Loan, a Colorado thrift, and were informed by Chairman M. Danny Wall that their jobs were in jeopardy if their performance did not improve. Some of these same individuals were later involved in the October 1989 Franklin examination.

58. The analyst in charge of Silverado, Thomas O'Rourke, was assigned to work full time on the Franklin examination and matters relating to Franklin beginning July 1, 1989.

59. Mr. O'Rourke noted that Franklin had in its portfolio similar assets to those formerly held by Silverado. This similarity probably slanted Mr. O'Rourke's view against Franklin and Franklin's system of operations.

60. Mr. O'Rourke reviewed and read Franklin's Form 10K (annual report) for the period ended June 30, 1989.· Mr. O'Rourke had previously read only one Form 10K and was unaware of the disclosures required in such a document. O'Rourke misperceived the cautionary disclosures of "material adverse risk" in the Form 10K as projections that the institution would experience difficulties. However, Franklin made these disclosures to fulfill its duty under federal securities laws. Such disclosures were included in earlier 10Ks filed by Franklin. After reviewing the Form 10K, Mr. O'Rourke drafted a memorandum changing Franklin's internal OTS classification from "healthy" to "marginal."

61. The disclosures presented in Franklin's 10K for the period ended June 30, 1989, were proper. The conclusions O'Rourke and OTS reached after reviewing the 10K, that the risks disclosed were likely or probable to occur, were arbitrary and capricious and without reasonable basis.

62. Members of the OTS–Topeka staff appeared to lack adequate training and understanding to evaluate the nature of Franklin's operation. The written analyses and memoranda prepared by the Topeka staff, including portions of Franklin's report of examination (Administrative Record Document 36), Mr. O'Rourke's review of Franklin's Form 10K (Exhibit 825), and the recommendation memo ("S Memo") dated February 12, 1989 (Administrative Record Document 6, also in evidence as Exhibit 469), contained fundamental factual errors as well as material errors of interpretation and analysis.

63. During the course of the 1989 examination, Franklin cooperated fully with OTS regarding each general and specific request for information.

64. On November 3, 1989, OTS–Topeka provided Franklin with a supervisory directive, which Franklin fully responded to by letter dated December 19, 1989. (Exhibits 314, 598). This December 19, 1989, letter was not made part of the administrative record designated by OTS.

65. On December 21, 1989, members of the OTS–Topeka staff met with Franklin representatives and informed Franklin that the OTS had calculated that Franklin must take approximately $248 million in capital write-downs because Franklin had inappropriately deferred that amount of hedging losses. At that meeting, OTS provided Franklin with a document entitled "Hedge Correlation Analysis Methodology" which set forth the way in which OTS had reviewed Franklin's hedges.

66. Franklin's hedge correlation policies were discussed between representatives of OTS, FDIC, Franklin and Deloitte and Touche at the January 8, 1990, examination exit conference; a meeting held on January 18, 1990; and a meeting held on February 8, 1990. The OTS, however, rejected all the justifications Franklin offered for its hedge correlation policy and reaffirmed its tentative conclusion that a large capital adjustment must be made regarding this issue.

67. At the time OTS presented the "Hedge Correlation Analysis Methodology" document to Franklin, representatives from OTS informed Franklin that OTS had recalculated Franklin's hedge correlation using the methodology described in the hedge

accounting memorandum. (Pretrial Order stipulation (j)). The "Hedge Correlation Analysis Methodology" document was not included in the administrative record. (Pretrial Order stipulation (k)).

68. In January 1990 Louis Roy informed Franklin that its proposal for reducing its portfolio of TB 12 assets as outlined in Franklin's December 19, 1989, letter was unsatisfactory. In response to this statement, Franklin prepared a letter dated February 8, 1990, outlining in detail the sensitivity of Franklin's TB 12 assets portfolio, as well as Franklin's proposal to reduce the size of its TB 12 portfolio and total assets over the coming months. (Exhibit 316.) This February 8, 1990, letter was not made a part of the administrative record designated by OTS. This letter indicates that OTS should have known that Franklin could have remained in compliance with all regulatory capital requirements, even if the financial statement adjustments ordered by OTS were ultimately upheld.

69. On January 8, 1990, representatives from OTS, KSLD and FDIC met with Franklin representatives to conduct an examination exit conference, as stated above. At this conference, OTS informed Franklin of the examination's preliminary results. Franklin would be required to make writedowns for inappropriate hedge accounting, and for improper over-valuation of property involved in Franklin's credit enhancement program. The OTS alleged that Franklin would fail its regulatory capital requirements as a result of these writedowns. Franklin resisted the proposed write-downs contending that the write-downs were invalid and lacked legal or factual basis.

70. Following the exit conference, Franklin's chief financial officer, Dennis Katzer, reviewed Franklin's bond indentures to determine if there were any problems. On January 11, 1990, Franklin informed OTS of the possibility of collateral substitution or legal defeasance of certain zero coupon bonds if the contested adjustments were ultimately upheld.

71. Prior to January 11, 1990, OTS had engaged in discussions with Franklin management with respect to the imposition of an individual minimum capital requirement ("IMCR") for Franklin. (Pretrial Order stipulation (n)). OTS's consideration of an IMCR for Franklin ceased sometime after Franklin's disclosure of the potential bond defeasance. (Pretrial Order stipulation (o)). Upon learning of the potential bond defeasance, OTS's internal classification for Franklin changed from "distressed" to "resolution I." (Pretrial Order stipulation (p)).

72. On January 22, 1990, Franklin met with OTS representatives to discuss OTS's apparent inaction with regard to various issues raised by the examination and to present OTS with certain alternative courses of action. Franklin did not at this meeting or any subsequent time consent to an appointment of a conservator or receiver.

73. Mr. Fleischer's draft letter of January 22, 1990 (Exhibit 623), does not evidence any consent to a conservatorship or receivership. The draft letter simply was used to discuss all possible outcomes. This draft letter was not part of the administrative record. Moreover, the legal memorandum ("L-memo") (Administrative Record Document 3) shows that OTS expected litigation if a conservator was appointed. The legal memorandum indicates that OTS knew Franklin had not consented to such an appointment. The legal memorandum stated: "OTS/legal believes that there may be a challenge to the proposed transaction."

74. The recommendation memo, or "S-memo," (Administrative Record Document 6) went through several drafts before the final form was executed. The draft preceding the final version was changed, on specific advice and instruction of OTS–Topeka district counsel, Brian McCormally. McCormally indicated that it was necessary to "point the finger" at Franklin's management. *See* handwritten instruction on Exhibit 826, p. 33 (T0026063). No factual or legal basis exists for McCormally's instruction. This action is indica-

tive of arbitrary, capricious and unreasonable conduct.

75. On February 14, 1990, Franklin issued its Form 10Q (Quarterly Report) for the quarter ended December 31, 1989. Prior to issuing this Form 10Q, Franklin provided it to OTS for review. OTS reviewed and discussed this Form 10Q with Franklin before it was filed. (Pretrial Order stipulation (r)). The Form 10Q clearly states that Franklin believed that OTS's proposed adjustments were not valid and that Franklin intended to oppose those adjustments by "all appropriate means." (Exhibit 624, p. 20.) The Form 10Q was not a report of capital failure and did not trigger any collateral substitution or legal defeasance remedies for the bond trustee under the indenture for the zero coupon bonds.

76. The OTS had initially scheduled to appoint the conservator for Franklin on February 14, 1990. OTS had scheduled a meeting with Franklin's board of directors for that date to provide the report of examination and to impose the conservatorship. On February 13, 1990, OTS director M. Danny Wall decided to impose a conservator for Franklin, but decided to postpone the takeover until after the release of Franklin's Form 10Q.

77. At the direction of Director Wall, the Franklin board meeting was rescheduled for February 16, 1990. At this meeting, OTS presented Franklin with the report of examination and informed Franklin that a conservator had been appointed for Franklin.

78. On February 14, 1990, Mr. Fleischer had spoken with a representative of the bond trustee, IBJ Schroder, concerning whether the publication on that day of Franklin's Form 10Q would constitute an event of default triggering the collateral substitution or legal defeasance provision of the bond indenture. The representative of IBJ Schroder informed Fleischer that the Form 10Q did not constitute an event triggering the default. During this conversation, the IBJ Schroder representative and Fleischer further discussed the possibility of a bond exchange which would in any event avoid or greatly lessen the loss from

any collateral substitution or legal defeasance.

79. The following day, February 15, 1990, Mr. Fleischer informed Thomas O'Rourke of the conversation with IBJ Schroder, and that the bond trustee was of the view that the Form 10Q did not constitute an event triggering default and also of the possibility of a bond exchange. Mr. O'Rourke was instructed by OTS district counsel McCormally not to follow-up on this information.

80. OTS had no contact, no conversation, and no correspondence with the bond trustee concerning any matter arising in connection with the zero coupon bond indenture prior to February 16, 1990. (Pretrial Order stipulation (t), (u) and (v)). Also, OTS did not contact the bond trustee to inquire whether any event had occurred or was about to occur that would trigger the collateral substitution or legal defeasance of the bonds. (Pretrial Order stipulation (w)).

81. At the February 16, 1990, board of directors meeting, OTS district counsel Brian McCormally informed Franklin that OTS's outside counsel had provided an opinion that the Form 10Q as published and the report of examination constituted an event of default allowing the bond trustee to begin collateral substitution or legal defeasance. This was erroneous.

82. No formal administrative hearing was held prior to the appointment of the conservator. (Pretrial order stipulation (h)).

83. Following the imposition of the conservator, OTS sent a letter, dated February 20, 1990, directing RTC/Franklin to make a $119 million write-down for inappropriate deferred hedging losses, a $46 million write-down due to inadequate valuation allowances for properties involved in Franklin's credit enhancement program, and a $185 million write-down on the basis that the bond defeasance was an event likely to occur. The RTC did make the $119 million and the $46 million write-downs. The RTC, as conservator for Franklin, at that time and subsequent times, resisted the pro-

posed bond defeasance write-downs as not appropriate in view of its power under FIRREA to repudiate the bond indentures. Franklin has never filed a report showing capital failure, and thus bond defeasance has never been an event likely to occur prior to the takeover of Franklin.

84. Following the OTS's February 20, 1990, directive concerning the hedge accounting and credit enhancement writedowns, Franklin nonetheless had the means to comply with all regulatory capital requirements through transactions already scheduled to occur. Exhibit 603 is a table showing Franklin's · available means to meet or exceed all regulatory capital requirements after the first wave of adjustments.

■■■ 85. The Savers Life intangible asset indicated in the table on Exhibit 603 relates to the purchase by Franklin subsidiary Savers Life Insurance Company of a block of insurance policies from Sun Life Insurance Company. The court finds that this intangible asset may be properly included in Franklin's capital because it meets the three requirements set out in 12 C.F.R. § 567.5(a)(2)(ii). First, the intangible asset is capable of being sold apart from Franklin's and Savers Life's other business. Second, a market clearly is established annually through an identifiable cash flow stream for the assets acquired. The market value of the cash flow stream is not in any way dependent on the future prospects of Franklin, and indeed the cash flow stream from Savers Life intangible bears no relationship to Franklin's other activities. Finally, a large market exists for blocks of insurance policies making this asset liquid. See Conclusion of Law No. 10.

86. Franklin properly included in its capital this amount of its investment in its Savers Life subsidiary, even though it was engaged in an activity not permitted for national banks. The amount of Franklin's investment in its Franklin Financial Services ("FFS") subsidiary in October of 1989, which was used to fund Savers Life's purchase of the block of insurance policies, did not exceed Franklin's investment in and

extension of credit to FFS as of April 12, 1989. Based on applicable law, this asset was properly included in Franklin's capital. See Conclusion of Law No. 11.

87. The "sale of assets" referred to in Exhibit 603 was a step which Franklin could take to meet capital requirements after the first wave of adjustments and was explained to OTS prior to the conservatorship in attachments to Mr. Fleischer's letters of December 19, 1989, and February 8, 1990.

88. On March 7, 1990, the RTC recorded some of the accounting adjustments set forth in OTS's February 20, 1990 directive. (Pretrial Order stipulation (af)). OTS learned that since RTC refused to make all the adjustments set forth in the, directive, Franklin would significantly fail only one of the three capital requirements imposed on Franklin by FIRREA and OTS regulations (tangible capital, core capital, and risk base capital). (Pretrial Order stipulation (ag), (ah), Exhibits 633, 686).

89. On or about March 8, 1990, OTS reviewed four alternative hedge accounting adjustments for Franklin. (Pretrial Order stipulations (ai)).

90. Prior to the imposition of the conservator, OTS had considered the four alternative hedge accounting adjustments which it reviewed again on March 8, 1990. (Pretrial Order stipulation (aj)). OTS Topeka apparently chose one of the four additional options prepared by Mr. Benson and considered it a "safety and soundness" concern to effect extra write-downs to its concern about historical asset sales. The option selected was basically a disallowance of the "six month grace period feature" of Franklin's hedge, accounting policy. See, infra., Finding of Fact No. 116.

■■■ 91. On March 8, 1990, OTS was informed by facsimile transmission that Franklin had available the means to meet regulatory capital requirements, even if the hedge accounting and credit enhancement write-downs were valid and that RTC was preparing to announce publicly that Franklin was a solvent institution. On the following day, March 9, 1990, OTS imposed a

second wave of adjustments consisting of an additional $61.9 million (later corrected to $51.9 million) (Exhibit 132) "safety and soundness" hedge accounting write-down and a write-down of $110 million relating to the tax agreements entered into between Franklin and FSC. The court finds that this second wave of adjustments imposed on March 9, 1990, was arbitrary and capricious and lacked any reasonable basis.

92. In view of the invalidity of OTS's proposed write-downs, Franklin exceeded all three regulatory capital requirements on December 31, 1989.

93. In view of the invalidity of OTS's proposed adjustments, Franklin exceeded all three regulatory capital requirements on March 31, 1990.

94. On June 1, 1990, OTS Director T. Timothy Ryan issued a "ratification and appointment order," which attempted to ratify the initial conservator appointed on February 15, 1990, and to appoint a new conservator based on an expanded administrative record. This court has determined that the purported ratification and appointment of a new conservator was invalid. *See* Memorandum and Order of June 22, 1990.

### D. *OTS's Directed Write-downs for Deferred Hedging Losses.*

95. At all times relevant to the October 1989 examination, Franklin was a liability hedger. On June 30, 1989, Franklin switched to operating as an asset hedger. As a liability hedger, Franklin deferred its gains and losses on its futures positions. The regulators initially became concerned with Franklin's hedge accounting program due to the significant increase in the amount of deferred hedging losses. During the 1988 exam, the Federal Home Loan Bank retained Dr. William C. Handorf to review Franklin's hedging program and method of accounting. Dr. Handorf's report is discussed, *supra.*, in Findings of Fact Nos. 43 and 44.

96. After reviewing plaintiff's hedging program and policies during the October 1989 examination, OTS directed that $119 million of hedged losses be written down

and recognized. OTS ordered these write-downs because certain aspects of Franklin's hedge accounting policy was not in accordance with GAAP according to OTS. Specifically, OTS determined that the write-downs were necessary because this amount of losses has been inappropriately deferred under Franklin's absolute value method of determining correlation and because of Franklin's inappropriate use of nonparallel shifts in the yield curve as unusual events to justify continuation of deferral accounting when correlation failed. Later, during the second wave of write-downs, which OTS directed against RTC/Franklin on March 9, 1990, OTS ordered an additional write-down and recognition of $51.9 million of deferred losses for safety and soundness reasons. Specifically, OTS found that Franklin's use of the six month initial grace period in its correlation determination policy to be an unsafe and unsound practice. Also, OTS was troubled by the $150,000 materiality factor and the rolling 12 month period of measuring correlation and substantial offset.

97. Regarding the accounting issues and matters raised in this case, this court finds that the testimony of Chester B. Vanatta to be credible and helpful to the court. Mr. Vanatta, a CPA, is a former managing partner of Arthur Young & Company and an experienced professional in general financial accounting. Mr. Vanatta has also lectured at the University of Kansas School of Business. The court finds Mr. Vanatta to be highly qualified to provide expert opinion concerning Statement No. 80 of the Financial Accounting Standards Board ("FAS 80") and its application to Franklin's deferral accounting procedures. Mr. Vanatta testified that Franklin's accounting treatment of its hedging program was in accordance with FAS 80 and with GAAP.

98. Also, the court finds that Professor Richard Leftwich was a credible witness and highly qualified to provide expert opinion testimony in the area of finance accounting. Professor Leftwich, a CPA, is a professor of accounting and finance at the graduate school of business of the Univer-

sity of Chicago. He has taught MBA courses in portfolio and risk management. Professor Leftwich testified that Franklin's hedges were working economically to reduce the institution's exposure to interest rate risk, and that the hedges were demonstrating high correlation and substantial offset, and that Franklin's accounting methods satisfied GAAP.

99. The court finds the testimony of John Smith, partner in the national office of Deloitte and Touche to be credible concerning hedge accounting.

100. Also, the court finds that Mary Standler, a CPA and former manager of financial reporting for Franklin, and Mark Woodward, comptroller at Franklin, were very credible witnesses. These witnesses were very knowledgeable in the field of finance accounting and with regard to deferral accounting under FAS 80.

101. The court gives little weight to the testimony of Alfred Schrott, a CPA and partner in the accounting firm of Spicer and Openhiem. Mr. Schrott testified that all challenged provisions of Franklin's hedge accounting policy were not in accordance with GAAP. Mr. Schrott had an extremely conservative view of GAAP regarding hedge accounting. Mr. Schrott's testimony was contradicted by the other more persuasive and credible expert witnesses. Moreover, Mr. Schrott had difficulties even with the method used by OTS to calculate the $119 million write-down.

102. Hedge or deferral accounting is the subject of considerable debate and a wide diversity of opinion in practice throughout the United States. The general guidelines for deferral accounting are set out in FAS 80. The application of the general guidelines set forth in FAS 80 to a particular institution requires a substantial amount of informed judgment on the part of the institution's management and its independent outside auditor. If a hedging transaction meets the general criteria set forth in FAS 80, gains or losses on the hedging transaction are deferred, instead of being currently recognized. The deferred gain or loss is amortized into the income statement over the life of the hedged item.

103. Franklin designated its hedged positions against the future repricing of short-term liabilities.

104. As a prerequisite to deferral accounting, FAS 80 requires that an enterprise interest rate risk exist. It is undisputed that Franklin properly identified and measured its enterprise interest rate risk as required by FAS 80.

105. As a prerequisite to deferral accounting, FAS 80 requires that a transaction be designated as a hedge at the time of its inception. This designation process serves to impose a discipline on the entity so that the decision whether to defer or recognize a currently hedged gain or loss will not be made after the entity observes the results of the transactions.

106. FAS 80 requires "high correlation" of the changes in the market value of the futures contracts and the value of the hedged items at the inception of the hedge and throughout the life of the hedge. FAS 80 requires that the results of the futures contracts "substantially offset" the effects of price or interest rate changes on the exposed item. Paragraph 4(b) of FAS 80.

107. FAS 80 requires "high correlation" between gains or losses on the hedging instrument and the gains or losses on the futures contracts. If high correlation has not occurred, the entity must cease deferral accounting and recognize a gain or loss to the extent the futures results have not been offset by the effects of price or interest rate changes on the hedged item. Paragraph 11 of FAS 80.

108. The hedge accounting issue in this case boils down to whether Franklin's policy and procedures for ascertaining the existence of high correlation and substantial offset in past periods on an ongoing basis are appropriate implementation of the general guidelines of FAS 80, in accordance with GAAP.

109. A deferral or hedge accounting practice need not be widely used in practice to be in accordance with GAAP as long as it is in accordance with FAS 80.

110. Based on the evidence presented, this court is convinced and finds that the hedge accounting policies dated June 30, 1988, and December 31, 1988, are consistent in all material effects and are in accordance with GAAP.

111. Since Franklin began using hedge accounting, its hedge accounting policy has been approved by its outside independent auditors, which includes the firms of Deloitte, Haskin, & Sells; Touche, Ross & Co.; and Deloitte & Touche.

1. Franklin's Hedge Correlation Policy.

112. Franklin's hedge correlation policy evolved over a period of time as the institution gained more experience and expertise in its hedging program and in the economic analysis of that program. Franklin did not develop its policy to create a biased view toward achieving maximum deferral. Franklin's desire in developing its correlation policy was to reflect the economic reality inherent in the hedging transaction. Franklin was rather unique since it memorialized its policy in writing.

113. Implementation of the Franklin hedge correlation policy involved a series of steps through which the accounting department ran each hedge on a monthly basis. The first step in the analysis is the initial correlation analysis based on the use of Franklin's absolute value method and using a rolling 12 months of data. Gains or losses on futures transactions are divided by gains or losses on the liabilities to determine whether an acceptable correlation ratio has been achieved. This is the process by which Franklin measured high correlation and substantial offset.

114. If the ascertained ratio falls within a band of −80 to −125 percent, the hedge is deemed to be in high correlation and to have achieved substantial offset. If the hedge had not failed correlation in a prior period, the gain or loss on the futures contract is then deferred and amortized. The gain or loss which is deferred and amortized reflects the actual results of the futures transaction. Absolute values are used only for the purpose of determining correlation and not for the purpose of recording the results of the futures transactions on Franklin's books and records or in its financial statements. If a hedge has failed in prior periods, deferral accounting would occur only if the hedge had been restructured.

115. OTS has concluded that correlation ratio within the range of − 70 to − 130 percent constitutes sufficiently high correlation for deferral accounting under FAS 80.

116. If after making the initial computation, the offset ratio obtained is outside the − 80 to − 125 percent correlation band, several steps occur in Franklin's analysis. If the hedge has not been in place for six months, a decision on whether to recognize or defer gains or losses is postponed until the end of the six month initial period. This is what has been called the six month initial grace period. In view of the anticipated seven year repricings of the hedged items, a six month period is reasonable and necessary to obtain a reliable data base for judging the hedge's effectiveness. If a hedge was indicating poor correlation in the first six months, Franklin's accounting department would consult with its treasury department about restructuring or terminating the hedge. If a hedge is terminated before the end of six months, all futures gains or losses in excess of the liability gains or losses are recognized currently and the balance is deferred. This recognizes that the hedge did achieve some offset on the hedged item and that it had a high probability of future correlation at the time the hedge was established.

117. If a hedge fails correlation and has been in existence for more than six months, the determination then is made about whether the amount of noncorrelation exceeds $150,000. If the amount of noncorrelation is less than $150,000, the hedge is deemed to be sufficiently correlated to permit continued deferral accounting. This aspect of Franklin's policy addresses the question of materiality, an overriding consideration under GAAP. Franklin analyzed this feature of the policy for OTS during the regulatory examination and demonstrated that its application did not provide

material distortions in Franklin's financial statements in prior periods. This analysis was provided to OTS, but was excluded from the administrative record. This provision of Franklin's correlation policy has been referred to as the $150,000 materiality factor.

118. If a hedge fails correlation and is older than six months and the amount of noncorrelation exceeds $150,000, the next step in Franklin's analysis determines whether the first month of the hedge caused the noncorrelation. Hedges often require some period of time to perform adequately. Franklin's policy makes allowance for the fact that a hedge may be put on late in a month and not have a full 30 days worth of performance to adequately judge correlation. If correlation failure is attributable to the first month performance, Franklin does a top-off adjustment, that is, Franklin recognizes gains and losses on the futures in excess of gains and losses on liabilities currently and defers the balance. Thereafter, the first month is excluded in subsequent correlation analysis. This provision of the policy has been referred to as the first month disallowance provision.

119. If the hedge fails correlation, is older than six months, and if the correlation failure is material and not attributable to the first month, Franklin's policy next requires a determination of whether unusual economic or market conditions caused the adverse correlation ratio. Under Franklin's policy, if noncorrelation is attributable to a month in which there has been a nonparallel shift in the yield curve, a top-off adjustment is made and deferral accounting is continued for the balance with the failure month disregarded in subsequent analysis. This provision has been referred to in various ways, including the nonparallel shift in the yield curve, or curve inversion, provision, or explainable event, or unusual event, provision.

120. If a hedge has failed correlation under Franklin's policy, futures gains and losses in excess of liability gains and losses are recognized currently in income. If the futures gains and losses are less than the liabilities gains and losses, no current recognition is appropriate because there has been some offset and the high probability in inception criteria has been met. There is no dispute in this case over this feature of Franklin's policy.

121. Franklin's hedge accounting policy was initially put into operation in late March or April 1988. Certain refinements in the correlation policy have been made since that time. However, these changes or refinements were not made for the purpose of maximizing deferral, but instead were made to more accurately reflect the economic reality underlying the hedge program.

122. In imposing the conservatorship on Franklin, OTS challenged primarily two aspects of Franklin's hedge accounting policy: (1) the absolute value technique for measuring correlation and substantial offset; and (2) the treatment of a nonparallel shift in the treasury yield curve as an explainable or unusual event justifying continuation of deferral accounting when correlation fails for that measuring period.

 2. The Absolute Value Method.

123. Franklin started using the absolute value method of determining correlation in late March 1988. Franklin began using this method after it discovered that the cumulative net dollar offset method failed some hedges that, in fact, had high correlation. OTS used the dollar offset method to calculate the directed $119 million writedown for inappropriate deferred losses [10].

124. The absolute value method and the dollar offset ratio method generally produce similar correlation ratio results as

---

**10.** Initially, the dollar offset calculation determined that $248 million in losses were wrongly deferred. The OTS modified this method by making allowances for what it called the "whip saw effect." OTS contends that this modification accounts for the dollar offset ratio method's shortcoming which results when the actual gains and losses approach zero. This "whip saw effect" adjustment resulted in a $37 million reduction to the original adjustment. After some additional corrections were made in the adjustments, OTS arrived at a figure of $119 million for what it considered inappropriately deferred losses.

long as interest rates move in one direction during a measuring period. If, however, the interest rates change directions during the measuring period, as frequently occurs, some changes in the values of the futures and liabilities, which offset each other, will nonetheless produce unacceptable correlation ratios if the dollar offset method is used. Thus, the actual economic nature of the hedge is not correctly reflected.

125. In general, implementation of the absolute value method occurs in any month in which the change in value of the futures transactions and the change in value of liability gains or losses in fact offset each other. If there are gains in both transactions or losses in both transactions, Franklin uses actual numbers. However, if the two sides of the hedge actually offset each other, absolute values are used so that all numbers for futures transactions are designated negative and all numbers for liability repricings are designated positive, for the sole purpose of measuring correlation. This approach allows the institution to ascertain whether the hedge is, in fact, working in a changing interest rate environment and requires that correlation actually reflect the underlying economic reality, which sometimes does not occur in the dollar offset method. The absolute value method compares the total movement in the value of the futures transactions and in the liabilities gains and losses.

126. When interest rates move in the same direction during a measuring period, both the dollar offset method and the absolute value method generally produce the same result in analyzing hedge correlation. The following table, using hypothetical numbers, illustrates this result:

| | Futures Hedge | Hedged Item | Absolute Value | OTS Dollar Offset |
|---|---|---|---|---|
| 1st mo. | + 60 | − 50 | | |
| 2d mo. | + 40 | − 40 | − 90% Correlation | − 90% Correlation |
| | 100 | − 90 | | |

127. When interest rates change directions during the measuring period, the dollar offset method has the effect of disqualifying many hedges which in fact show high correlation. The following table comparing the absolute value and dollar offset methods illustrates this result:

**DOLLAR OFFSET METHOD**

| | Futures Hedge | Hedged Item | Correlation Ratio |
|---|---|---|---|
| 1st mo. | − 60 | − 50 | |
| 2d mo. | − 40 | − 40 | − 50% Correlation |
| | 20 | − 10 | |

**ABSOLUTE VALUE METHOD**

| | Futures Hedge | Hedged Item | Correlation Ratio |
|---|---|---|---|
| 1st mo. | − 60* | + 50* | |
| 2d mo. | − 40 | + 40 | − 90% Correlation |
| | − 100 | 90 | |

\* absolute value designation

Under the dollar offset method, which compares the net change in the futures and hedged item positions, the hedge fails correlation even though for each individual month involved the ratio between the futures item and the hedged item shows high correlation and substantial offset. Under the absolute value method, whenever offset exists (*i.e.*, the hedge moves in one direction and the hedged item moves in the opposite direction), a negative value is assigned to all changes in the futures position and a positive value is assigned to all changes in the hedged item. By changing the signs in this manner, the absolute value method measures the strength of the relationship between the hedge and the hedged liabilities, without regard to the shifts in the direction of interest rates during the measuring period. Franklin's method of determining high correlation is more in accordance with economic reality than the dollar offset method used by OTS. The hedge is performing its economic function, for changes in liability values are substantially offset by gains and losses on the hedge.

 128. After considering the analyses and testimony of the various experts and the explanation of Franklin's application and use of the absolute value method, brought out in the testimony of Ernest Fleischer, Mary Standler, and Mark Woodward, the court finds that Franklin's use of the absolute value method is a reliable method of testing correlation, which accurately measures high correlation and substantial offset as required by FAS 80.

3. Nonparallel Shifts in the Treasury Yield Curve as Unusual Events.

129. Most accounting practitioners agree that a hedge should not be disqualified or that deferral accounting should be discontinued based solely on an isolated unusual event. Franklin's hedge correlation policy permitted monthly activity to be disregarded in subsequent correlation analysis if a nonparallel shift in the treasury yield curve caused the noncorrelation for that month. *See, supra,* Findings of Fact No. 119.

130. OTS has taken issue with this portion of Franklin's hedge correlation policy and has determined that it is not GAAP, and therefore, its use to be a violation of OTS regulations. OTS used this decision, in addition to its disapproval of the use of the absolute value method, to justify its ordered GAAP write-downs regarding the deferred hedging losses.

 131. The court finds that plaintiffs have established that the use of nonparallel shifts in the yield curve as unusual events in Franklin's correlation policy is a reasonable application of FAS 80 and accords with GAAP. This finding is based on the fact that this provision of Franklin's policy was certified by its independent accountant, Deloitte and Touche, and the testimony of credible and reliable expert witnesses.

4. Safety and Soundness Write-downs Regarding Hedge Accounting Policy.

132. In a letter dated March 9, 1990, OTS ordered RTC/Franklin to record a second wave of hedge accounting adjustments in the amount of $61.9 million (later corrected to $51.9 million). This second wave of hedge accounting adjustments was based on "safety and soundness" concerns and not GAAP requirements.

133. These safety and soundness write-downs for hedging losses primarily result from OTS's decision that the six month initial grace period provision of Franklin's hedge accounting correlation policy is an unsafe and unsound policy. OTS criticized other elements of the hedge correlation policy as unsafe and unsound, including the rolling 12–month data provision and the use of the $150,000 materiality provision. These provisions are discussed in detail, *supra*, in Findings of Facts Nos. 116–119. OTS believed that the use of these provisions of the policy allowed improper deferral of losses.

134. On March 8, 1990, OTS was informed by RTC that even after the initial write-downs (excluding the bond defeasance write-down which RTC refused to make), Franklin was still solvent and could meet its tangible capital requirement. The next day OTS ordered the second wave of adjustments. It appears that the second wave of adjustments was an attempt by OTS to justify its earlier appointment of the conservator.

135. The expert opinion evidence presented in this case clearly convinces the court that the challenged provisions of the Franklin's correlation policy are safe and sound practices. OTS acted in an arbitrary and capricious manner and without reasonable basis in directing this second wave of write-downs relating to the hedge accounting policy.

### 5. Other Safety and Soundness Concerns Regarding Franklin's Hedge Program.

136. In addition to concerns about the method of accounting for deferred hedging losses, the regulator also expressed concern about the overall level of deferred losses acquired by Franklin, the recognition of gains from the sales of assets, and whether such sales affect the deferral of future losses.

137. During the quarter ended June 30, 1989, the amount of Franklin's deferred losses increased substantially. This significant increase, however, primarily resulted from a 150 basis point drop in interest rates during that time period.

138. These additional deferred losses will be offset by repricing gains to occur in the future. The amount or level of deferred hedging losses incurred by Franklin have not been shown to present any safety or soundness issue as long as the offsetting gains are in place. Neither the level nor the amount of deferred hedging losses have been shown to create any legitimate safety or soundness concerns.

139. Franklin's hedging program has not caused any economic losses to the institution.

140. There exists no relationship between the accounting gains on sales of assets and the amount of Franklin's deferred hedging losses. The court finds OTS's unsupported assertions to the contrary to be without reasonable basis.

141. Between June 30, 1984, and September 30, 1989, Franklin sold investment securities and options and recorded $429.8 million in gains on these sales.

142. Franklin has shown that there is no relationship between these sales of assets and any futures transactions. These sales did not trigger a recognition of deferred losses.

143. Gains on anticipated liability repricings have not been realized by historical asset sales. Exhibit 604 illustrates that asset sales have not detracted from Franklin's anticipated repricing gains. Most of these asset sales involve: (1) assets for which no future contracts were shorted at the time of acquisitions; (2) assets whose sale was accompanied by a write-off of deferred hedge losses because both were held in a subsidiary; and (3) assets whose disposition and associated deferred hedge losses were examined and approved by the regulators in 1985.

144. Franklin was not dependent on gains from the sales of assets to conduct profitable operations. For each year from June 30, 1983, through December 31, 1989, Franklin had net income after taxes, with gains and losses from sale of assets and discontinued operations excluded.

E. *OTS's Write-downs Regarding Credit Enhancement Program.*

145. One of the regulator's basis for the imposition of the conservator was OTS's conclusion during the examination that an additional $46.9 million valuation allowances in loss reserves should be established for Franklin's credit enhancement program. Franklin had previously established $19 million in loss reserves for this program.

146. The basic dispute between the regulator and the institution regarding the credit enhancement program was whether the value of available favorable financing on these projects should be included as part of the value of the credit enhancement properties. Franklin contended that the appropriate amount of loss reserves should take into consideration the value of favorable financing on these properties. OTS concluded that the existence of favorable financing could not be considered in determining the amount of necessary reserves. (Testimony of Bruce Benson, T. 3080; testimony of Kurt Schoeb, T. 2422).

147. Franklin's credit enhancement program involves transactions in which Franklin would issue letters of credit to enhance the investment ratings of tax exempt variable rate bonds which had been issued by a governmental entity. The proceeds of these bonds were loaned to developers to construct or rehabilitate multi-family residential real estate. Franklin issued irrevocable letters of credit to the bond trustees guaranteeing timely payments on the bonds. In exchange for Franklin's issuing the letters of credit of guaranteeing the payments to the bond holders, the project developer agreed to reimburse Franklin for all payments made under the letter of credit. The developers provided a fixed rate of interest on its obligation to Franklin, and also paid monthly fees to Franklin. Franklin and the bond trustee held a first mortgage on the properties and Franklin held a second mortgage on the properties. In addition, the developer arranged for an unrelated party to pledge to Franklin certain property, outside collateral, with a value of approximately 25 percent of the bond debt.

148. As of September 30, 1989, Franklin had outstanding 16 letters of credit on such projects.

149. Each of the properties at issue in Franklin's credit enhancement program has transferable tax exempt below market favorable financing, at approximately 200 basis points below the going rate for real estate financing. This favorable financing is made possible by the governmental entity that issued the bonds.

150. Several of the developers in this program, and the outside collateral providers, are in default to Franklin. Under the current situation, GAAP requires that Franklin treat such properties as already acquired through an "in substance foreclosure".

151. The issue involving the credit enhancement program concerns the classification of assets for the purpose of establishing loss reserves. OTS regulations require that valuation allowances be established pursuant to GAAP for classified assets. *See* 12 C.F.R. § 563.160(d)(3). Under GAAP, in substance foreclosures are recorded at fair market value. The court finds that it has been established that the below market tax exempt bond financing on each of these properties is an economic attribute that may be recognized in this valuation process under GAAP. Even defendant's own expert witness, William Trione, acknowledged that such favorable financing has some value. Thus, the court finds that the value of the tax exempt bond financing may be properly considered in the establishment of loss reserves.

152. After learning that OTS was questioning whether favorable financing had market value in determining the valuation allowance of the properties in Franklin's credit enhancement program, Franklin commissioned a set of investment value analyses which took into account the investment value attributable to the available favorable financing. These analyses indicated that such favorable financing had value in the market place.

153. Franklin has presented other evidence that indicates that this favorable fi-

nancing has recognized value in the market. Mr. Schoeb testified that there has been a recent offer to purchase the Chesapeake Estates property at a price above the "cash equivalency" appraisal value. The cash equivalency appraisal value did not consider the value of the favorable financing. This offer of purchase was contingent on the assumability of the favorable bond financing. This offer of purchase above the value appraised without consideration of favorable financing indicates that such financing does have value in the market.

■■■ 154. The court finds that there is recognized value in the market for the bond financing involved in the credit enhancement properties, and that 12 C.F.R. § 563.171(b)(2)(i)(E) is not applicable to the facts presented. *See* Conclusion of Law No. 9. The court further finds that the value of such financing may properly be taken into account in determining the value allowances for those properties and establishing loss reserves. The OTS's attempt to establish a higher loss reserve based on its refusal to consider value for the available favorable financing is without reasonable basis and is based on an inappropriate application of a regulation.

F. *OTS's Write-downs Regarding Bond Defeasance.*

155. After the directed write-downs of $119 million for alleged inappropriate deferred hedging losses, and $46.9 million for inappropriate value allowances on the credit enhancement program, and $12.5 million for other valuation allowances and the exclusion of the Savers Life intangible, OTS directed an additional $185 million reduction in Franklin's capital to account for the bond defeasance of the $2.9 million zero coupon bond issuance made in 1984. *See, supra.,* Finding of Fact No. 22. OTS concluded that after the reductions were made for the other write-downs, Franklin would fail to meet its core and tangible capital requirements. OTS considered that this failure of capital requirements would likely trigger the bond defeasance/collateral substitution provision of the bond indenture. Bond defeasance or collateral substitution

would result in a realization of $185 million reduction in Franklin's capital. Therefore, OTS ordered this additional write-down in capital.

156. ·The bond indenture provides that if Franklin files a report showing that it is out of capital compliance, the bond trustee is authorized to buy and substitute collateral that would have the effect of economically defeasing the bond. The bond indenture also provides for collateral substitution or legal defeasance if Franklin fails to file a required report for 25 days.

157. Prior to the February 16, 1990, appointment of conservatorship, Franklin never filed a report showing capital failure which would trigger defeasance of the bond indenture. Specifically, Franklin's 10Q for the period ended December 31, 1989, states that all the adjustments proposed by OTS would be resisted by "all appropriate means." Since OTS's directive concerning Franklin's method of hedge accounting and allowance for favorable financing in the credit enhancement program was wrong and clearly without reasonable basis, at the time of conservator imposition; any loss from collateral substitution or legal defeasance on the zero coupon bonds was not an event likely to occur.

■■■ 158. The court believes that the OTS improperly relied on the bond issue in reaction to its failure to act promptly with respect to similar zero coupon bonds issued by CenTrust Savings Bank of Miami, Florida. OTS wanted to avoid embarrassment, such as that caused by its failure to promptly act and to prevent a loss on the CenTrust bonds. Franklin, however, was not in the same position as CenTrust with regard to zero coupon bonds. Franklin had never reported capital failure as had CenTrust. OTS's attempt to draw a parallel between Franklin's case and CenTrust's case was improper. An OTS internal memo even indicates that the regulator knew that Franklin was not in the same situation as CenTrust. Exhibit 827 ("Well, it ain't CenTrust, but it's all we got.") OTS's action regarding the directed write-down for bond defeasance was arbitrary

and capricious and without reasonable basis in law or fact.

### G. Safety and Soundness Grounds for Conservatorship.

#### 1. Tax Agreements Between Franklin and Franklin Savings Corp.

159. Franklin and its parent company, FSC, entered into tax reimbursement and tax forgiveness agreements. The tax forgiveness agreement began in 1985, at which time the Federal Home Loan Bank was fully informed and acquiesced to the agreements. The amount of this annual tax forgiveness is set forth in each year's audited accounting statements for Franklin and the federal regulators have been fully apprised of the content of these agreements each year from 1985 through the present.

160. Similar tax agreements have been entered into by at least one other thrift in the OTS/Topeka district with the approval of the regulator at the time it was initially executed.

161. Throughout the time that the tax agreements between Franklin and FSC have been in force, Franklin's excess regulatory capital has exceeded the cumulative amount of tax forgiveness. Franklin maintained the tax forgiveness agreements as part of capital only to provide a capital cushion and not for the purpose of leveraging the institution or to increase its growth.

162. At the time the conservatorship was imposed, no taxes were due or owing by FSC or Franklin under the tax agreements.

163. At all times, FSC has had the means available to pay any tax which would become due under the tax forgiveness and tax reimbursement agreements.

164. Franklin has accounted for the tax agreements in accordance with GAAP.

165. In the event any tax is ever owing, the tax can be paid by the holding company either through borrowing money, selling stock, or by liquidating Franklin. Under no situation would the tax be paid by having Franklin pay a dividend to FSC. The operation of the tax agreements between Franklin and FSC are wholly unlike the operation of the tax agreements in the *Lincoln Savings* case. The tax agreements in the *Lincoln Savings* case were clever devices used for upstreaming funds from the savings association to the parent company. *See Lincoln Savings,* 743 F.Supp. 901, *supra,* at 909–910.

166. On January 9, 1990, OTS informed Franklin of the regulator's concern about the tax agreements and that it would seek a write-down of $110.4 million to reflect the value of the tax agreements included in Franklin's capital. After correspondence was exchanged between Franklin and OTS, OTS decided to hold the tax agreements issue in abeyance pending further consideration.

167. The tax agreements were not a basis for the initial conservatorship decision, but instead were raised only as part of the second wave of adjustments ordered on March 9, 1990. In the March 9, 1990, directive, OTS stated that Franklin's handling of the tax agreements was an unsafe and unsound practice and ordered a $110.4 million write-down in capital.

168. OTS has no written policy governing the tax agreements at issue in this case. The court finds that the OTS acted arbitrarily and capriciously and without reasonable basis in seeking to create a written policy regarding tax agreements, after the fact, when no such policy existed. *See* Exhibit 393. This court finds that plaintiffs have shown that the tax agreements in this case raise no issue of safety or soundness and provide no reasonable basis to support the imposition of a conservator.

#### 2. OTS's Concerns Over Franklin's Innovative Methods of Operation.

##### i. Franklin's Reliance on Brokered Deposits.

169. Over the past five years, Franklin's reliance on brokered deposits has increased significantly. As of December 31, 1989, Franklin had $3,290,981,000. in brokered deposits which represented 70.7 per-

cent of its total deposits and 37.2 percent of its total liabilities. The regulator found that brokered deposits represented a high cost of funds and that Franklin's reliance on brokered deposits placed the institution in an unsafe and unsound condition.

170. The court finds Mr. Fleischer's testimony regarding Franklin's brokered deposits transactions to be highly credible and persuasive.

171. Franklin has submitted monthly brokered deposit reports to the Federal Home Loan Bank and to OTS since June 1984. Franklin has kept OTS fully apprised of its brokered deposit transactions.

172. From June 30, 1988, through February 12, 1990, Franklin's cost for brokered deposits declined from 124 basis points over the U.S. treasury yield curve to 82 points over the yield curve.

173. During the second half of 1989, Franklin determined that it could reduce its funding cost for brokered deposits by taking steps to level out the amount of brokered deposits that would be maturing each week. To accomplish this goal, Franklin increased the amount of brokered deposits in November and December of 1989. This increase was to enable Franklin to reduce its cost of brokered deposits beginning January 1, 1990. By leveling the amount of brokered deposits maturing each week, Franklin was able to set an interest rate significantly under the market and consistently obtain brokered deposits at that below market rate.

174. In determining its cost of funds, Franklin considers the costs associated with servicing depositors' accounts in addition to the interest being paid to depositors. In determining its "all-in-cost" for brokered deposits, Franklin computes the interest rate paid to the depositors, the fee paid to the brokerage firm, the insurance costs and the FDIC fee, and the associated overhead cost. To fairly compare the cost of funds between institutions, all associated costs must be considered, such as the cost of processing checks or to operate a branch facility. By analyzing costs on an all-in basis, Franklin's brokered deposits are shown to not constitute an unusually high cost of funds, but actually are shown to represent a relatively low cost of funds.

▆▆▆▆ 175. This court finds that OTS has failed to consider all relevant information in analyzing Franklin's use of brokered deposits. Further, the court finds that OTS's conclusion that such funds as used by Franklin were a high cost of funds is without reasonable basis. The court finds that Franklin's liability portfolio of brokered deposits presented no safety or soundness issue at the time the conservatorship was imposed.

### ii. *Cost of Funds.*

176. The OTS determined that Franklin's cost of funds was consistently higher than both the average cost of funds for Kansas thrift associations and for all thrifts throughout the nation. According to OTS calculations, Franklin's cost of funds as of December 31, 1989, was 10.02 percent whereas the average cost for Kansas thrifts was 8.37 percent and the national average for thrifts was 8.3 percent. The regulator found that Franklin's reliance on higher cost of funds caused it to invest in higher yielding and riskier assets, and thus, created an unsafe and unsound condition of operation.

177. OTS's comparison of Franklin's cost of funds and the cost of funds of other institutions is misleading. First, OTS does not compare the all-in-cost of funds among the institutions. OTS does not take into account the institutions' cost of operating branch facilities and other such costs involved in acquiring deposits. Secondly, OTS compared Franklin, which hedges its funding cost, with other institutions which did not hedge. Therefore, Franklin's cost of funds includes hedging costs, whereas the cost of funds figures for the other institutions do not include such hedging costs. Thus, the sharp drop in interest rates occurring in the quarter ended June 30, 1989 (150 basis points), caused Franklin to defer hedging losses of approximately $240 million during that period. These deferred hedging losses are reflected in Franklin's cost of funds, but not in the cost

of funds of the comparison institutions which do not hedge. This comparison of cost of funds by OTS omits the repricing gains which will result from the declining cost of liabilities when those liabilities reprice in the future, and thus, is inherently misleading.

178. Franklin has shown that its historical cost of funds is not relevant to any investment decision made by Franklin. Therefore, OTS is incorrect in concluding that Franklin's cost of funds results in investments in riskier assets. In making its investment decisions, Franklin looks at what it would cost Franklin to fund a particular asset in question, not the historical cost of funds. Franklin's investments at all times were governed by the determination of the option adjusted spread remaining between the interest income on assets and the cost associated in acquiring and carrying those assets, taking into account all risks associated with the asset. Thus, Franklin's cost of funds had nothing to do with the investments being acquired, other than to establish a base or floor return which would have to be achieved after giving full recognition to all costs.

179. This court finds that the OTS's comparison of cost of funds between Franklin and other institutions was performed in a manner which fails to consider relevant facts, and thus, is inherently misleading. Plaintiffs have shown that Franklin's cost of funds did not present a safety or soundness concern at the time of the imposition of the conservator.

### iii. *TB 12 Assets.*

180. Since 1986, Franklin has increased the amount of assets in its portfolio of the type described in *Thrift Bulletin No. 12* (TB 12 assets), such as principal-only strips ("POs"), interest-only strips ("IOs"), collateralized mortgage obligation residuals ("CMOs"), and support traunches of planned amortization classes of CMOs. Franklin's mortgage backed security ("MBS") portfolio increased from $388 million as of June 30, 1983, to $1.1 billion as of December 31, 1984. By June 30, 1989, Franklin had acquired $187 million in high yield bonds and $3.6 billion in mortgage derivative products, which represented 35 percent of Franklin's total assets.

181. OTS criticized the amount of Franklin's TB 12 assets. OTS found that Franklin's increased concentration in these securities presented safety and soundness concerns. Also, OTS felt that after its directed adjustments for credit enhancement and deferred hedging losses were made, the institution was materially undercapitalized to possess TB 12 assets.

182. TB 12 assets are extremely sensitive to changes in interest rates and prepayment rates and also have a significant prepayment risk. To accurately value TB 12 assets, Franklin must accurately predict prepayment rates and otherwise model the performance of these assets. The failure to accurately do so could result in these assets being significantly over or under valued.

183. Franklin has demonstrated that through the efforts of its management and the use of computer modeling, the sensitivity of its TB 12 asset portfolio to both interest rate risk and prepayment risk had declined from June 30, 1988, through October 31, 1989, and was anticipated to continue declining through June 30, 1990.

184. As a result of this declining interest rate and prepayment sensitivity, Franklin's TB 12 asset portfolio had approximately the same sensitivity as the 9.5 percent GNMA mortgage back security.

185. The OTS was also concerned with the liquidity of TB 12 assets. Franklin has clearly demonstrated that a market exists for TB 12 assets. In fact, Franklin acquired all of its TB 12 assets in market transactions from firms which are primarily dealers in such assets.

186. OTS's criticism about the level of TB 12 assets held by Franklin is inappropriate. Pursuant to OTS direction, Franklin has been shrinking its amount of TB 12 assets since November 1, 1989, and has completed a net shrinkage of $605 million in its TB 12 portfolio.

187. The court finds that Franklin was properly monitoring and managing its

TB 12 assets portfolio. The court finds that Franklin's possession of and the amount of TB 12 assets in its portfolio did not raise legitimate safety or soundness concerns. The OTS's conclusions to the contrary are without reasonable basis.

### iv. *Computer Models.*

188. Franklin's computer models, including its prepayment model in use at the time of the conservatorship (FSA–3), have been accurately described as "state of the art or very close to it." (Administrative Record, Document No. 34 or Exhibit 272 (McConnell Report) and testimony of Walter Torous). In particular, FSA–3 is a very good indicator of prepayment risk and is a significant improvement over FSA–1, the earlier prepayment model which also had been considered as state of the art. Furthermore, the option adjusted spread models used by Franklin are sophisticated management tools.

189. This court has considered and reviewed carefully the expert testimony provided by the parties concerning Franklin's computer models. The court finds that the testimony of Dr. Walter Torous is highly credible and persuasive. Dr. Torous, professor of finance at the UCLA School of Business, has extensively studied Franklin's models, including both the FSA–1 and the FSA–3 models, and has found that those models provide an accurate indicator of prepayment risk.

190. Franklin's models were used as tools in investment and hedging decisions and in estimating the institution's net equity value. Franklin's management used the information provided by models to assist them in making judgment decisions.

191. From the evidence presented to this court, the court has no difficulty finding that Franklin had assembled an exceptionally able and experienced staff to develop its computer models and to interpret and appropriately apply the information generated by those models.

 192. The court finds that Franklin's use of sophisticated and complex computer models do not raise significant safety and soundness concerns which would justify the regulator's action.

### 3. Other Safety and Soundness Issues.

193. The safety and soundness issues regarding Franklin's deferred hedging losses and sales of assets has already been discussed in previous findings of fact, *see, supra.,* Findings of Fact Nos. 132–144.

194. OTS has at various times suggested other "safety and soundness" concerns. The court finds that these other raised concerns are not supported in the record, and therefore, provide no basis for the appointment of conservator.

195. Since 1984, Franklin has never sought to use all its regulatory capital. For the fiscal year ended June 30, 1985, through the fiscal year ended June 30, 1989, Franklin's use of regulatory capital ranged from 35 percent to 65 percent. The average usage of regulatory capital for all those years is approximately 54 percent.

196. Franklin's distribution of dividends raises no issues of safety and soundness. OTS and FHLBB have either approved or raised no objections to any dividend distribution made by Franklin during the past five years. (Pretrial Order stipulation (ay)).

197. Franklin's portfolio of high yield, or "junk," bonds presents no issue of safety and soundness. As of June 30, 1989, Franklin's portfolio contained approximately $187 million in high yield bonds, roughly 2 percent of its assets. Franklin's board had decided to dispose of all these assets on or by June 30, 1990, well before the 1994 disposition date required in FIRREA.

198. In this case, the safety and soundness issues raised by OTS are unconvincing since Franklin had GAAP capital of $387 million on December 31, 1989, and an economic value of not less than that amount. Also, since June 30, 1988, through the time of the imposition of the conservator, Franklin had shown increases in capital, both measured under a GAAP basis and by analyzing the institution's economic value. GAAP capital had been increasing by an average of $55 million per year.

199. For the fiscal years ended June 30, 1988, and June 30, 1989, Franklin had over $90 million of net interest income. From June 30, 1986, through June 30, 1989, net interest income represented an increasing share of the total income reported by Franklin.

200. Franklin's net interest margin has deteriorated over the last five years from 2.01 percent for the year ended June 30, 1985, to .95 percent for the year ended June 30, 1989. Once adjustments are made so that the net interest margin accurately reflects the economic situation of Franklin, however, the evidence shows that Franklin achieved the 100 basis point (1 percent) net interest margin that it had targeted over the past five years. The net interest margin equals the net interest income for a period divided by total assets. To determine the adjusted net interest margin for Franklin, it is necessary to consider two factors. First, the assets represented by Franklin's collateralized mortgage obligation ("CMO"), should be deconsolidated, so that the assets which Franklin has pledged to owners of traunches within the CMO are removed from the calculation of net interest margin. Secondly, the estimated cost of operating Franklin's branches should be deducted from Franklin's net interest income. After considering these adjustments, the court finds that Franklin has achieved its 100 basis point net interest margin over the past five years.

201. The lower net interest margin reported by Franklin as of December 31, 1989, resulted from GAAP accounting anomalies and was not indicative of the economic health of Franklin. The net interest income had been squeezed during the accounting period ended December 31, 1989, by the amortization of deferred hedging losses in advance of the recognition of gains from liability repricings which offset those hedging losses. The anomaly had a particularly significant effect during the quarter ended June 30, 1989, when interest rates dropped by 150 basis points, causing significant futures losses up to a year in advance of the liability repricing gains which would offset those losses. Also, the decline in net interest margin for the period ended December 31, 1989, also was affected by the flattening of the treasury yield curve during that period.

202. The court finds the testimony of Dr. Samuel Stewart to be reliable concerning the economic value of Franklin as a going concern. Dr. Stewart has a PhD from Stanford in finance and has taught at Columbia University and the University of Utah. Dr. Stewart is president of Wasatch, Inc., an investment firm. Dr. Stewart has had extensive experience in valuing savings and loan institutions and in counseling investments in such institutions based on his evaluations.

203. The court accepts as reliable Dr. Stewart's estimate of the going concern value of Franklin as of February 15, 1990, to equal between $250–700 million.

204. During the examination of Franklin, OTS had retained Dr. John McConnell, a professor at Purdue University, Lafayette, Indiana, to examine Franklin's modeling technology and to determine Franklin's economic value. Dr. McConnell concluded that Franklin's economic net worth would have a liquidation/replacement value of approximately $129.7 million as of September 30, 1989. The court does not find that the liquidation/replacement value is relevant or meaningful when considering the economic value of a going concern such as Franklin, which has economic capital and liquidity reserves. Moreover, Dr. McConnell's testimony during cross-examination created questions about the accuracy of his figures.

205. Dr. Darrell Duffie, professor of finance at Stanford University, was called as a witness by the OTS to testify about the types of risk facing Franklin's operations, his reservations with Franklin's computer models, and the changes in Franklin's net equity value.[11] Dr. Duffie's testimony con-

11. The court is aware that a motion to strike Exhibit No. 2813 is still pending. The court took this motion under advisement during Dr. Duffie's testimony on July 17, 1990. Plaintiff moved that this exhibit be stricken from the record since Duffie could not provide the

sisted of theoretical evaluations of the risks presented to Franklin's operation and other thrifts in general. Moreover, Dr. Duffie's testimony was largely an attempt by OTS to provide some post hoc justification for the regulator's action. The court finds that Dr. Duffie's testimony is of little help in this case and grants it little weight regarding the practical reality of Franklin's economic condition and operations and the necessity for appointing a conservator.

206. The testimony of Dr. Stewart and the other evidence presented by Franklin, including the fact that Franklin had a GAAP capital of $387 million as of December 31, 1989, provides clear proof that Franklin was not insolvent or in a weakened condition at the time the conservator was imposed and that Franklin presented no risk to the Savings Association Insurance Fund (SAIF).

207. From the year ended June 30, 1985, through the year ended June 30, 1989, Franklin showed positive income when measured under GAAP, economic, and normalized conventions. For the year ended June 30, 1989, Franklin showed GAAP earnings of $43 million, economic earnings of $78 million and normalized earnings of $99 million.

208. Given the fact that the hedge accounting, credit enhancement, tax agreement and bond defeasance issues are ultimately resolved in Franklin's favor, the court finds that it is clear that the safety and soundness issues raised by OTS provide no basis for the imposition of a conservatorship.

### H. *Charges of Biased or Prejudiced Action by OTS.*

■■■ 209. Franklin has contended that OTS acted with improper bias and prejudice and in bad faith against Franklin. Although the court has found that the OTS

lacked statutory grounds for the imposition of conservator and that the regulator made erroneous findings and conclusions which lacked any reasonable basis, the court finds that the regulator's actions cannot be characterized as biased or prejudiced against Franklin or taken in bad faith. It is most likely that OTS/Topeka was motivated by the disturbing events that had occurred earlier with regard to Silverado Savings and Loan in Colorado and its difficulty with Franklin's unique and innovative operations. Nevertheless, the court finds that Franklin has not shown that OTS was motivated in its decisions regarding the 1989 examination and the ultimate imposition of the conservator in February 1990 by bias or prejudice against Franklin or out of any type of bad faith.

### III. CONCLUSIONS OF LAW.

#### A. *General Conclusions.*

1. The court incorporates the legal conclusions made earlier in this Memorandum and Order regarding the proper role of the court in reviewing the regulator's actions. *See, supra.,* pp. 2–13.

2. Any finding of fact herein which should have been deemed a conclusion of law is hereby adopted as such, and any conclusion of law which should have deemed a finding of fact is hereby adopted as such.

#### B. *Statutory Grounds for the Appointment of a Conservator.*

3. Section 301 of FIRREA (to be codified at 12 U.S.C. § 1464(d)(2)(C)) grants the director of the Office of Thrift Supervision the power to appoint a conservator or receiver of a state chartered federally insured savings association if, in the opinion of the director, any of the grounds specified in 12 U.S.C. § 1464(d)(2)(C)(i) through

---

records or reports for the numbers used in that exhibit. The court granted defendant 48 hours to show the foundation for that document and defendant made such a submission on July 19, 1990 (Doc. 361). The court has received and has considered the letter memorandum of plaintiff responding to this submission and defendant's reply thereto (Docs. 383 and 384). The

court finds that the motion to strike should be denied. The court will allow Exhibit 2813 to remain in the record. The court is fully aware of the errors in the numbers used by Dr. Duffie as pointed out in plaintiff's letter response (Doc. 383) and has considered the corrected accurate numbers in consideration of this exhibit and of Dr. Duffie's testimony.

(vi) exist with respect to the savings association.

4. The director may appoint a conservator or receiver with the written approval of the state official having jurisdiction over the state savings association if one or more of the grounds specified for such appointment exist. 12 U.S.C. § 1464(d)(2)(D)(i).

5. Director Wall determined that three of the six statutory grounds for appointing a conservator existed with respect to Franklin Savings. The director found that:

(1) the association was in an unsafe and unsound condition to transact business, including having substantially insufficient capital or otherwise, 12 U.S.C. § 1464(d)(2)(C)(iii);

(2) the savings association had incurred or was likely to incur losses that would deplete all or substantially all of its capital and there was no reasonable prospect for the association's capital to be replenished without federal assistance, 12 U.S.C. § 1464(d)(2)(C)(v); and

(3) there was a violation or violations of laws or regulations, or an unsafe and unsound practice or condition which was likely to cause insolvency or substantial dissipation of assets and earnings, or was likely to weaken the condition of the association, 12 U.S.C. § 1464(d)(2)(C)(vi).

■ 6. In an action seeking the removal of a conservator, this court "shall upon the merits dismiss such action or direct the director to remove such conservator." 12 U.S.C. § 1464(d)(2)(E). In reviewing whether the statutory grounds existed for OTS to appoint a conservator, the sole question before the court is whether the director reasonably determined that a statutory ground existed at the time the institution passed into conservatorship. *Biscayne Federal Savings & Loan Ass'n v. FHLBB*, 720 F.2d 1499, 1504 (11th Cir. 1983), *cert. denied* 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984); *see also Woods v. FHLBB*, 826 F.2d 1400, 1407 (5th Cir.1987), *cert. denied* 485 U.S. 959, 108 S.Ct. 1221, 99 L.Ed.2d 422 (1988).

7. FIRREA and OTS regulations require savings and loan associations, including Franklin, to account for gains or losses on financial futures contracts, designated as hedges, in accordance with generally accepted accounting principles. Section 301 of FIRREA, 103 Stat. 280 (to be codified at 12 U.S.C. § 1463(b)(1), (2)); 12 C.F.R. § 563.233 (OTS regulation mandating compliance with GAAP). An accounting procedure which accords with a pronouncement of the Financial Accounting Standards Board, such as FAS 80, is by definition a generally accepted accounting principle.

8. The Supreme Court has noted:

Accountants long have recognized that "generally accepted accounting principles" are far from being a canonical set of rules that will insure transactions. "Generally accepted accounting principles," rather, tolerate a range of "reasonable" treatments leaving the choice among alternatives to management.

*Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 544, 99 S.Ct. 773, 787, 58 L.Ed.2d 785 (1979).

■ 9. OTS argues that its conclusion not to consider the value of favorable financing is required by applicable federal regulations, *citing* 12 C.F.R. § 563.172(a) and 12 C.F.R. § 563.171(b)(2). These regulations require that real estate, at the time of in substance foreclosure or actual acquisition, must be appraised at its fair market value. 12 C.F.R. § 563.171(b)(2)(i). The regulation further requires that the "price for the property represent normal consideration for the property sold unaffected by special or creative financing granted by anyone associated with this sale." 12 C.F.R. § 563.171(b)(2)(i)(E). The court finds that this provision of the regulation is inapplicable to Franklin's credit enhancement program. In the credit enhancement properties, the favorable financing is made possible by the bond issuer who makes loans to the developer at a lower than market rate of interest. Therefore, the favorable financing involved in the credit enhancement programs is not provided by "anyone associated with the sale."

10. 12 C.F.R. § 567.5(a)(2)(ii) sets forth an exception to the general rule that intan-

gible assets may not be included as part of a savings association's capital. Such assets may be included in determining core capital if (1) the asset is separate and sold apart from the savings association; (2) the asset has an established market value based on an identifiable stream of cash flows which will not be affected by the future prospects of the savings association; and (3) a market exist which will provide liquidity for the asset. 12 C.F.R. § 567.5(a)(2)(ii). Based on the established facts, the block of Sun Life Insurance policies purchased by Franklin's subsidiary are includable assets in Franklin's capital.

■ 11. Generally, a savings association's investment in or extension of credit to any subsidiary engaged in activities not permissible for a national bank shall be deducted from the association's capital. Section 301 FIRREA, 103 Stat. 305–306 (to be codified at 12 U.S.C. § 1464(t)(5)(A)). However, such investments may be included in capital if the association's subsidiary was involved in the activity before April 12, 1989. The association may include in calculating capital an amount up to the amount of the association's investments in or extension of credit to the subsidiary as of April 12, 1989. FIRREA, 103 Stat. 306 (to be codified at 12 U.S.C. § 1464(t)(5)(D)). Based on the facts established, Franklin could properly include in its capital calculation the amount of its investment in the Savers Life subsidiary.

■ 12. Issues of safety and soundness must be viewed in the context of the institution as a whole. *Gulf Federal Savings & Loan Ass'n v. Federal Home Loan Bank Board*, 651 F.2d 259, 264 (5th Cir. 1981), *cert. denied* 458 U.S. 1121, 102 S.Ct. 3509, 73 L.Ed.2d 1383 (1982). "The breadth of the unsafe or unsound practice formula is restricted by its limitation to practices with a reasonably direct effect on an institution's financial soundness." *Id.*

■ 13. Based on all the findings of fact established above, it is this court's conclusion of law that the OTS acted inappropriately in placing Franklin in conservatorship, and that the OTS lacked any factual basis which would justify its appoint-

ment of a conservator under the three statutory grounds relied on by the regulator. This court further concludes that the OTS acted arbitrarily and capriciously in appointing the conservator. Accordingly, the court will order the director of OTS to remove the conservator and return control of Franklin to its former board of directors and management.

C. *Whether the Appointment of the RTC as Conservator for Franklin Creates an Incurable Conflict of Interest.*

14. In Count VI of their complaint, plaintiffs contend that the RTC should be removed as conservator because it has an incurable conflict of interests which prevents it from being able to fulfill it fiduciary and conservatorship obligation to Franklin and its stockholders. This allegation is based principally on the fact that at the time of its appointment, RTC was already serving as a conservator for Victoria Savings Association. At the time of the appointment, Franklin was prosecuting a lawsuit on a claim of $36 million against Victoria Savings. Since the court has found and concluded that the OTS had no statutory ground for appointing a conservator for Franklin, and will order the removal of the conservatorship, the court finds it unnecessary to address this now moot issue.

D. *Constitutional Claims.*

■ 15. In Count VIII of their complaint, plaintiffs contend that the actions of the OTS violated their constitutional rights of due process, since they were not afforded a hearing prior to the seizure of the institution. The provisions of 12 U.S.C. § 1464(d)(2)(E) provide plaintiffs with an opportunity for post-conservatorship hearing. The fact that judicial review is available only after the deprivation of property has occurred does not render that available review constitutionally inadequate. *See Haralson v. FHLBB*, 837 F.2d 1123, 1126 (D.C.Cir.1988). As the Supreme Court has commented, regulations that provide for a hearing after a conservator takes posses-

sion of an institution is a drastic procedure. *Fahey v. Mallonee*, 332 U.S. 245, 253, 67 S.Ct. 1552, 1554–56, 91 L.Ed. 2030 (1947). However, given the nature of the savings and loan industry and the significant governmental interest in the regulation of federally insured savings and loan associations, the requirements of constitutional due process are accomplished by the provision allowing for a hearing after the government's drastic action. *See id.;* and *Haralson*, 837 F.2d at 1126–27. Accordingly, the court concludes that there is no violation of plaintiffs' constitutional right of due process by the regulatory scheme provided and set out in FIRREA, given the fact that plaintiffs have been provided a full and meaningful opportunity to present their case and to challenge the government's action after the appointment of the conservatorship.

16. In Count VII of their complaint, plaintiffs argue that the appointment of the conservator was an unconstitutional taking in violation of the Fifth and Fourteenth Amendments of the Constitution. The relief that plaintiffs seek on this claim is the removal of the conservator. Since the court, for other reasons, will grant the relief that plaintiffs seek on this claim, the court finds that it is unnecessary to address plaintiffs' constitutional taking claim.

### E. *Improper or Retroactive Rule Making.*

17. OTS has stated that accounting statements prepared by savings associations "shall be prepared on the basis of generally accepted accounting principles." 54 Fed.Reg. 49,595 (Nov. 30, 1989); *see also* 54 Fed.Reg. 49,683, 49,684, 49,685 (Nov. 30, 1989); and 54 Fed.Reg. 49,627, 49,628 (Nov. 30, 1989).

18. Any OTS determination specifying accounting requirements more stringent than GAAP must be uniform and must be promulgated by regulation under the APA. FIRREA, 103 Stat. 280 (to be codified at 12 U.S.C. § 1463(B)(1), (3)). In Counts III and IV of their complaint, plaintiffs argue that the OTS improperly required compliance with standards more

stringent than GAAP without going through the appropriate rule making process required by the APA and retroactively applied these more stringent rules. The court concludes that OTS was not attempting to retroactively apply new, more stringent standards in reviewing Franklin's hedge accounting policies and tax agreements. Simply, OTS was advocating an erroneous interpretation of GAAP and wrongly holding that Franklin's practices were not GAAP, and consequently in effect, OTS required accounting methods more stringent than GAAP. This was not a case of improper or retroactive rule making, but one of erroneous application of existing regulatory rules.

### IV. FINAL COMMENT.

The court's concern and review in this case is limited to whether the OTS acted properly in February 1990 in appointing a conservator for Franklin. The court realizes that Franklin is not the same institution today that it was as of February 16, 1990, after six months of control by RTC. There could very well be some difficulty in Franklin's management reacquiring control and operating Franklin today. That, however, is not the court's concern. The court was asked to determine whether the regulator's action was valid and appropriate at the time it was taken. We have performed this task in an expeditious and judicious manner.

The facts of this case clearly show that the regulator acted wrongly in imposing the conservatorship. This court must correct that wrongful action. Any problems in the reacquisition of control by Franklin's management is a direct result of the OTS's wrongful conduct in February 1990.

It will now be the responsibility of Franklin's management, and not the court, to effectively develop a plan for operating the association after six months of conservatorship, during which they had no control.

Finally, the court, in its order, will retain jurisdiction for a period of 90 days, during which the OTS cannot attempt to impose a conservator or receiver for Franklin with-

out first obtaining leave of this court to do so. Although the court retains jurisdiction for this limited purpose, this decision is an appealable final judgment and the time for appeal is not affected by the court retaining jurisdiction for the limited purpose set out herein.

IT IS THEREFORE BY THE COURT ORDERED that since no statutory ground for the imposition of a conservatorship existed and since the OTS's action in imposing the RTC as conservator lacked any basis in fact and was arbitrary and capricious, the director of OTS is hereby ordered to remove the conservator now in place and to return control of Franklin Savings Association to its preconservatorship directors and management at 10 a.m. CDT, Thursday, September 6, 1990.

IT IS FURTHER ORDERED that both parties and the RTC cooperate fully to facilitate an orderly transfer of control of the institution.

IT IS FURTHER ORDERED that plaintiffs' motion to strike Exhibit 2813 is denied.

IT IS FURTHER ORDERED that plaintiffs' second motion for summary judgment (Doc. 183) is rendered moot by the above memorandum and it is therefore denied.

IT IS FURTHER ORDERED that defendant's motion for summary judgment on Counts I and II and for judgment on the pleadings on Counts VI, VII and VIII, and for summary judgment for lack of capacity (Doc. 174) has been rendered moot by the above memorandum and is therefore denied.

IT IS FURTHER ORDERED that the court will retain limited jurisdiction in this case for a period of 90 days, during which period the OTS cannot attempt to place Franklin into another conservatorship or a receivership without first obtaining leave of this court to do so.

IT IS FURTHER ORDERED that the court's retention of jurisdiction for this limited purpose does not affect the parties' rights to pursue an appeal or affect the time for filing notice of appeal from this final judgment.

IT IS FURTHER ORDERED that the Clerk of the Court enter judgment in this case for the plaintiffs.